# United States Court of Appeals

## For the First Circuit

No. 10-1405

MICHAEL HUFFINGTON,

Plaintiff, Appellant,

v.

T.C. GROUP, LLC; THE CARLYLE GROUP; CARLYLE CAPITAL CORPORATION, LTD.; CARLYLE INVESTMENT MANAGEMENT, LLC; DAVID M. RUBENSTEIN,

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Patti B. Saris, U.S. District Judge]

Before

Lynch, Chief Judge,

Boudin and Howard, Circuit Judges.

John A. Tarantino with whom Paul V. Curcio, Philip Y. Brown, Edward F. Whitesell, Jr. and Adler Pollock & Sheehan P.C. were on brief for appellant.
Robert A. Van Kirk with whom Vidya A. Mirmira, Jonathan E. Pahl and Williams & Connolly LLP were on brief for appellees.

February 25, 2011

**BOUDIN**, **Circuit Judge**. This appeal concerns a forum selection clause in a securities contract. Michael Huffington, a Massachusetts resident, made a $20 million investment in a fund raised by The Carlyle Group ("Carlyle"), a trade name for T.C. Group, LLC, a global investment management firm organized under Delaware law with its principal place of business in Washington, D.C. The investment occurred after Huffington had discussions with David Rubenstein, a founder and managing director of Carlyle.

According to the complaint, whose allegations we accept as true for purposes of this appeal, Chmielinski v. Massachusetts, 513 F.3d 309, 311 (1st Cir. 2008), there had been earlier discussions between Huffington and Rubenstein about Carlyle's private equity business, but Huffington expressed reservations about private equity because of his cautious investment philosophy and told Rubenstein that he "wanted something more conservative." Rubenstein told Huffington that he would check on Carlyle investment products more suitable for Rubenstein's risk profile.

On August 29, 2006, Carlyle formed Carlyle Capital Corporation, Ltd. ("the fund"), which was to be managed by Carlyle Investment Management with the stated goal of achieving "risk-adjusted returns." Unlike most of Carlyle's offerings, the fund was not private equity but was rather an independent, Guernsey-

based company;[1] its aim was to invest in fixed-income securities, primarily residential mortgage-backed securities issued by the Federal National Mortgage Association ("Fannie Mae") and the Federal Home Loan Mortgage Corporation ("Freddie Mac"). The value of such securities depends, of course, on the cash flow generated by the mortgages and the prospects that the principal and interest will be paid.

According to Huffington, Rubenstein--in a visit to the former's home in Boston--presented the fund as a lower risk investment vehicle that would suit Huffington's philosophy and told Huffington that Carlyle and the fund used a conservative investment strategy that avoided "overleverage." Rubenstein followed up with a letter repeating that the fund was a lower risk investment with limited downside. Other materials from Carlyle and telephone conversations with John Stomber, who was in charge of the fund, reinforced this message.

On January 9, 2007, Huffington, using an investment vehicle whose details are irrelevant to this appeal, committed to purchasing shares of the fund for $20 million. As part of the commitment, Huffington executed a subscription agreement ("the agreement"), which governed his rights and duties as a shareholder

---

[1]Carlyle asserts that the fund is a Guernsey limited company now in liquidation proceedings and is not controlled by Carlyle, T.C. Group, Carlyle Investment Management, or Rubenstein (together "the Carlyle defendants"). The fund did not join the brief submitted by the Carlyle defendants and did not file its own brief.

in the fund.  The agreement included a choice of law clause and a forum selection clause.  The choice of law clause provided:

> [T]he parties expressly agree that all terms and provisions hereof shall be governed, construed and enforced solely under the laws of the State of Delaware, without reference to any principles of conflicts of law (except insofar as affected by the state securities or "blue sky" laws of the jurisdiction in which the offering described herein has been made to the Investor).

The forum selection clause provided: "The courts of the State of Delaware shall have exclusive jurisdiction over any action, suit or proceeding with respect to this Subscription Agreement . . . ."

On January 26, 2007, Huffington met with Stomber and other Carlyle representatives and was told--for the first time, he claims--that the fund would be leveraged.  Nevertheless, Huffington received assurances that despite the fund's use of leverage, he should not be concerned about its risk.  On February 20, Carlyle notified Huffington that the fund had accepted his commitment, and Huffington wired his $20 million investment.

In the spring, summer, and fall of 2007, Huffington made inquiries about the status of the fund and was repeatedly assured by Stomber that his investment was safe.  But even as these reassurances were given to Huffington, the fund's performance began to suffer because the value of mortgage-backed securities held by the fund started declining.  In March 2008, the fund--having leveraged its equity thirty-two times to buy securities--defaulted

on its loans and, its traded shares having plunged to less than ninety-eight percent of their initial offering price, went into liquidation.

On July 13, 2009, Huffington brought suit in Massachusetts state court alleging three claims against the Carlyle defendants and the Guernsey-based fund for allegedly misrepresenting the risks associated with the fund: (1) a violation of the Massachusetts Blue Sky Law (formally, the Massachusetts Uniform Securities Act), Mass. Gen. Laws ch. 110A, § 410 (2008), (2) common-law misrepresentation, and (3) a violation of the Massachusetts Consumer Protection Act, Mass. Gen. Laws ch. 93A, § 11. The Carlyle defendants removed the case to federal court.

On February 19, 2010, the district court dismissed Huffington's claims without prejudice, Fed. R. Civ. P. 12(b)(6), concluding that the forum selection clause encompassed his claims and that the clause did not offend Massachusetts public policy. Huffington v. T.C. Group, LLC, 685 F. Supp. 2d 239, 244 (D. Mass. 2010). Huffington now appeals to contest this ruling, whose correctness turns on legal issues that we review de novo, Rafael Rodríquez Barril, Inc. v. Conbraco Indus., Inc., 619 F.3d 90, 92 (1st Cir. 2010). Although the Carlyle defendants assert that Huffington was made well aware of both the prospective leverage and the risks associated with the investment, the merits of the

controversy are not before us--only the proper venue for their determination.

A forum selection clause may make the designated forum merely available for resolution of disputes or it may make it "exclusive," at least in the sense that either side can insist upon it as the venue. See Rivera v. Centro Médico de Turabo, Inc., 575 F.3d 10, 17 (1st Cir. 2009). In this case, both sides agree that the clause is exclusive; the issues primarily in dispute are whether the clause covers the claims set forth in Huffington's complaint and, if so, whether the clause is enforceable.

We start with the coverage question. The terse language of the forum selection clause, already quoted in full, makes Delaware courts the exclusive forum for "any action, suit or proceeding with respect to this Subscription Agreement." Huffington argues that his claims are not "with respect to" the agreement because he advances no contract claim and his stated statutory and common-law tort claims rest on alleged misrepresentations that occurred before he signed the agreement.

Under the choice of law clause, the agreement itself-- necessarily including the forum selection clause--is (the blue sky exception aside) governed by Delaware law; but the parties do not claim that Delaware law varies from ordinary contract principles. Nor do they suggest that the forum selection clause is illuminated by any extrinsic evidence, say, of pre-contract negotiations about

it.  So the scope question turns, as often is so with contracts, on plain language, attributed purpose, available precedent, and any background policy considerations that may bear.

Starting with language, see Rivera, 575 F.3d at 19, Huffington's position would wear well if the clause encompassed only claims "to enforce or for breach of" this agreement, e.g., Jacobson v. Mailboxes Etc. U.S.A., Inc., 646 N.E.2d 741, 744 (Mass. 1995) ("all actions enforcing this agreement"); but the clause by its terms reaches any claim "with respect to" the agreement and easily invites a broader application. This is confirmed by the usual sources: dictionaries and case law construing such phrases.

Dictionaries describe the phrase "with respect to" as synonymous with the phrase "with reference or regard to something," 13 The Oxford English Dictionary 732 (2d ed. 1989) (emphasis omitted); and they define the word "respect" in the context of the phrase as meaning simply "relation," "reference," "connection," or "association" to a particular thing.[2]  Thus, a suit is "with respect to" the agreement if the suit is related to that

---

[2]E.g., The American Heritage Dictionary 1052-53 (2d coll. ed. 1991) (defining "respect" as "[r]elation; reference"); The Random House Dictionary of the English Language 1640 (2d ed. unabr. 1987) (defining "respect" as "relation or reference"); Webster's Third New International Dictionary 1934 (unabr. 2002) (defining "respect" as "a relation or reference to a particular thing or situation"); West's Legal Thesaurus/Dictionary 644, 657 (spec. deluxe ed. 1986) (defining "respect" as "relation" and "relation" in turn as a "connection or association").

agreement--at least if the relationship seems pertinent in the particular context.

So, too, courts describe the phrase "with respect to" as synonymous with the phrases "with reference to," "relating to," "in connection with," and "associated with," and they have held such phrases to be broader in scope than the term "arising out of," to be broader than the concept of a causal connection, and to mean simply "connected by reason of an established or discoverable relation." Coregis Ins. Co. v. Am. Health Found., Inc., 241 F.3d 123, 128-29 (2d Cir. 2001) (Sotomayor, J.) (collecting authorities); see also John Wyeth & Bro. Ltd. v. CIGNA Int'l Corp., 119 F.3d 1070, 1074-75 (3d Cir. 1997) (Alito, J.).

Huffington counters that the "misrepresentations at issue would be actionable regardless of whether the parties executed a contract," but that is not quite so. On some facts a misrepresentation can be actionable without a contract, but the alleged "misrepresentations at issue" are actionable here, on Huffington's own theories of liability, only because they caused him to enter into an agreement whereby he made an unfavorable purchase. In a nutshell, only if the misrepresentations proximately caused the agreement and consequent acquisition was there a recoverable loss.

Indeed, the purchase could not have been made without the agreement. The fund was offered privately, in reliance upon the

exemption from registration under section 4(2) of the Securities Act of 1933, 15 U.S.C. § 77d(2) (2006), and Regulation D, 17 C.F.R. § 230.501-.508 (2010). In accordance with the exemption, prospective investors were required to "execute and deliver a complete Subscription Booklet, which includes a subscription agreement."

Each cause of action Huffington asserted has as a prerequisite the loss that flowed from the agreement and acquisition. The Blue Sky claim is for misrepresentations creating liability "to the person buying the security." Mass. Gen. Laws ch. 110A, § 410(a)(2). A misrepresentation claim under Massachusetts common law requires an act causing loss in reasonable reliance upon a misrepresentation, Masingill v. EMC Corp., 870 N.E.2d 81, 88 (Mass. 2007)--again, in this case the contracted-for purchase. The 93A claim too depends on a "loss of money or property." Mass. Gen. Laws ch. 93A, § 11.

Finally, forum selection clauses have varying purposes, but one reasonably inferred where, as here, a security is being offered to a range of customers is to concentrate all related litigation in a single forum. This assures the defendant that it will be able to litigate all of the actions in one place convenient to it; that one set of rules will apply; that consolidation may be readily available; that inconsistent outcomes can be minimized; and that a single lead precedent can control all cases. We do not, in

-9-

passing on a motion to dismiss, rely on Carlyle's more specific but perhaps disputable version of its intent.[3]

Forum selection clauses using embracing language are common and have usually been construed broadly.[4] Courts have often contrasted this language with narrower language--<u>e.g.</u>, "to enforce," "to construe"--that could easily have been employed if a narrower focus were intended. E.g., <u>John Wyeth & Bro.</u>, 119 F.3d at 1075; <u>Jacobson</u>, 646 N.E.2d at 744-45. Tellingly, the precedents offered by Huffington are from this latter category and readily distinguishable. E.g., <u>Computer Sales Int'l, Inc.</u> v. <u>Lycos, Inc.</u>, No. Civ.A.05-10017 RWZ, 2005 WL 3307507, at *2 (D. Mass. Dec. 6, 2005).

This brings us to the issue of enforceability and, once again, as in <u>Conbraco</u>, 619 F.3d at 92, we can sidestep the <u>Erie</u> question, <u>Erie R.R. Co.</u> v. <u>Tompkins</u>, 304 U.S. 64 (1938), of whether to treat the issue of a forum selection clause's enforceability as "procedural" (and so look to federal law for a test) or as "substantive" (and instead look to state law). That is because, in

---

[3]The Carlyle defendants say that centralization was important to Carlyle because, among other reasons, the fund was a foreign entity, incorporated in Guernsey; was marketed to investors in foreign countries; and, after early rounds of private financing, traded on a foreign exchange in Amsterdam.

[4]E.g., <u>ACE Capital Re Overseas Ltd.</u> v. <u>Cent. United Life Ins. Co.</u>, 307 F.3d 24, 30 & n.2 (2d Cir. 2002) (Sotomayor, J.) (citing cases); <u>Coregis Ins. Co.</u>, 241 F.3d at 128-29 (citing cases); <u>Roby</u> v. <u>Corp. of Lloyd's</u>, 996 F.2d 1353, 1361 (2d Cir.), <u>cert. denied</u>, 510 U.S. 945 (1993).

-10-

determining enforceability, both Delaware and Massachusetts follow the federal common-law standard described by the Supreme Court in The Bremen v. Zapata Off-Shore Co., 407 U.S. 1 (1972).[5]

Under Bremen, "the forum clause should control absent a strong showing that it should be set aside," 407 U.S. at 15, and the party resisting enforcement bears the "heavy burden" of demonstrating why the clause should not be enforced, id. at 17. The Supreme Court has listed four grounds for finding a forum selection clause unenforceable:

> (1) the clause was the product of "fraud or overreaching," id. at 15;
>
> (2) "enforcement would be unreasonable and unjust," id.;
>
> (3) proceedings "in the contractual forum will be so gravely difficult and inconvenient that [the party challenging the clause] will for all practical purposes be deprived of his day in court," id. at 18; or
>
> (4) "enforcement would contravene a strong public policy of the forum in which suit is brought, whether declared by statute or by judicial decision," id. at 15.

See also Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc., 473 U.S. 614, 632-33 (1985) (discussing Bremen's factors).

The first three conditions can be put aside. The first is triggered not by claims that the contract was induced by fraud

---

[5]Ingres Corp. v. CA, Inc., 8 A.3d 1143, 1145 & n.8 (Del. 2010); Aveta, Inc. v. Colón, 942 A.2d 603, 607 n.7 (Del. Ch. 2008); Cambridge Biotech Corp. v. Pasteur Sanofi Diagnostics, 740 N.E.2d 195, 201 (Mass. 2000).

-11-

but only by a focused showing--which Huffington does not attempt--that "the inclusion of that clause in the contract was the product of fraud or coercion." Scherk v. Alberto-Culver Co., 417 U.S. 506, 519 n.14 (1974) (emphasis omitted). Although Huffington says that fairness and convenience support a Massachusetts forum, he does not show that litigating in Delaware, as agreed, is unreasonable or unjust.

If the second condition turned on "contacts" or "convenience," Huffington might have something to argue about since Massachusetts was his residence and he received a visit and communications in the state relating to the purchase. But both context and association with other terms (fraud, unjust, strong public policy) make clear that the second condition is more demanding. See also Carnival Cruise Lines, Inc. v. Shute, 499 U.S. 585, 595 (1991). The third--requiring practical impossibility--is even clearer on this point. Furness v. Wright Med. Tech., Inc. (In re Mercurio), 402 F.3d 62, 66 (1st Cir. 2005).

Huffington invokes an unpublished district court decision, Nutracea v. Langley Park Invs. PLC, No. 2:06-cv-2019-MCE-DAD, 2007 WL 135699 (E.D. Cal. Jan. 16, 2007), in which the court declined to enforce a stock purchase agreement's forum selection clause that denominated New York as the forum, basing its decision on convenience, fairness, and California public policy, id. at *1-*3. Nutracea relied in part on flexible venue transfer criteria,

28 U.S.C. § 1404(a) (2006), see 2007 WL 135699 at *1, *3--not the Bremen requirements that bind us in this case. As the Second Circuit explained:

> The same broad-based balancing [in a motion to transfer venue] is not appropriate where, as here, a party seeks to have an action dismissed or remanded to state court, rather than transferred, on the basis of a forum selection clause that purports to preclude litigation from a venue other than a specific state court.

Jones v. Weibrecht, 901 F.2d 17, 19 (2d Cir. 1990) (per curiam); see also Langley v. Prudential Mortg. Capital Co., 546 F.3d 365, 369 (6th Cir. 2008).[6]

Huffington's core challenge rests on Bremen's fourth factor: that "enforcement would contravene a strong public policy of the forum in which suit is brought, whether declared by statute or by judicial decision," 407 U.S. at 15. Huffington argues that the public policy underpinning the Massachusetts Blue Sky Act requires that courts in Massachusetts must always retain jurisdiction over such claims. If so, that policy might carry weight even assuming that it was not binding under Erie. Compare Albemarle Corp. v. AstraZeneca UK Ltd., 628 F.3d 643, 651-53 (4th

---

[6]Nutracea also relied on what it understood to be public policy considerations adopted by the California courts to protect claims under its state securities law statute. Even assuming that Massachusetts courts took the view attributed to California, Massachusetts' interest in its statute is adequately protected in this case for reasons discussed below.

Cir. 2010), with Doe 1 v. AOL LLC, 552 F.3d 1077, 1085 (9th Cir. 2009) (Nelson & Reinhardt, JJ., concurring) (per curiam).

However, by its terms, the Massachusetts Blue Sky Law simply creates a cause of action making liable--for any material misrepresentation causing loss--a person who offers or sells a security in Massachusetts. Mass. Gen. Laws ch. 110A, § 410(a)(2). Nothing cited to us suggests that the cause of action can be litigated only in a court located in Massachusetts or that Massachusetts forbids dismissals where a forum selection clause specifies a different forum. Massachusetts securities law claims are not uncommonly brought in other jurisdictions.[7]

Huffington points us to the anti-waiver provision of the Massachusetts Blue Sky Law, which invalidates any agreement by the buyer to "waive compliance with any provision of this chapter or any rule or order hereunder," Mass. Gen. Laws ch. 110A, § 410(g). In the analogous federal securities context, a "chorus of authority," Haynsworth v. The Corporation, 121 F.3d 956, 960 (5th Cir. 1997), cert. denied, 523 U.S. 1072 (1998), has held that anti-waiver provisions, e.g., 15 U.S.C. §§ 77n, 78cc(a), do not categorically render forum selection clauses unenforceable. Lipcon

---

[7]E.g., F.W. Webb Co. v. State St. Bank & Trust Co., No. 09-Civ. 1241(RJH), 2010 WL 3219284, at *15-*16 (S.D.N.Y. Aug. 12, 2010); In re Nat'l Century Fin. Enters., Inc., 541 F. Supp. 2d 986, 1010-11 (S.D. Ohio 2007); I-Enter. Co. v. Draper Fisher Jurvetson Mgmt. Co. V, No. C-03-1561 MMC, 2005 WL 3590984, at *24-*26 (N.D. Cal. Dec. 30, 2005).

-14-

v. <u>Underwriters at Lloyd's, London</u>, 148 F.3d 1285, 1295 (11th Cir. 1998) (joining seven circuits), <u>cert. denied</u>, 525 U.S. 1093 (1999).

Finally, Huffington argues that the Massachusetts statute has terms quite favorable to the buyer. <u>E.g.</u>, <u>Marram</u> v. <u>Kobrick Offshore Fund, Ltd.</u>, 809 N.E.2d 1017, 1025-27 (Mass. 2004). Ordinarily, a forum selection clause is respected even if the forum state would substitute its own remedy, so long as the chosen forum will itself provide an <u>adequate</u> remedy. <u>Lipcon</u>, 148 F.3d at 1297. But the outcome <u>might</u> be different if Delaware were likely to substitute a substantially less powerful remedy in the teeth of a strong Massachusetts policy.

However, while a Delaware choice of law clause (quoted above) appears in the agreement, <u>that</u> clause--unlike the forum selection clause--is addressed to interpretation and enforcement of <u>the agreement</u> and not to all claims "with respect to" the agreement; and, anyway, the choice of law clause provides that Delaware law controls "except insofar as affected by the state securities or 'blue sky' laws of the jurisdiction in which the offering described herein has been made to the Investor." This seems at first blush to preserve Huffington's Massachusetts Blue Sky Law claim at issue.

Huffington does not directly argue that a Delaware court would refuse to enforce the Massachusetts Blue Sky Law--he has filed a protective action in Delaware setting forth that very

claim--and apart from <u>Nutracea</u>, 2007 WL 135699, at *1-*3, the precedents to which he points involve cases where the plaintiffs would have had no adequate remedy in the selected forum because of their inability to maintain a lawsuit in that forum, <u>e.g.</u>, <u>Brown</u> v. <u>Scrips Invs. & Loans, Inc.</u>, No. C08-1166 RSM, 2009 WL 1649947, at *4-*6 (W.D. Wash. June 11, 2009).

In all events, Huffington agreed that "related to" claims would be litigated <u>in</u> Delaware--where he remains free to argue that the Massachusetts Blue Sky claim survives by virtue of Massachusetts law, the choice of law clause's narrower language, or this clause's blue sky exception. Here, as in <u>Conbraco</u>, 619 F.3d at 95, as against mere doubts (if any) that the claim would not survive, which would only juxtapose a possible Massachusetts interest against the explicit agreement, the agreement prevails.

There remains to be addressed only Huffington's suggestion that the enforceability of the forum selection clause should be certified to the Massachusetts Supreme Judicial Court if we have any doubt about state law on the issue. Certification is not routine, is rarely done where not requested in the district court, and is not necessary here--this case having been excellently briefed and argued on both sides in this court.

<u>Affirmed.</u>