# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

Argued February 22, 2019          Decided June 18, 2019

No. 18-7055

FARHAD AZIMA,
APPELLEE

v.

RAK INVESTMENT AUTHORITY,
APPELLANT

---

Appeal from the United States District Court
for the District of Columbia
(No. 1:16-cv-01948)

---

*Linda C. Goldstein* argued the cause for appellant. With her on the briefs were *Michael H. McGinley* and *D. Brett Kohlhofer*.

*Laura G. Ferguson* argued the cause for appellee. With her on the brief were *Kirby D. Behre, Charles F.B. McAleer, Jr.*, and *Ian A. Herbert*.

Before: GRIFFITH and MILLETT, *Circuit Judges*, and EDWARDS, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* GRIFFITH.

GRIFFITH, *Circuit Judge*: Farhad Azima and the Ras Al Khaimah Investment Authority (RAKIA) were once business partners. But disagreements arose. As part of a broad settlement of their grievances with one another, they agreed to litigate all future, related claims in England. RAKIA argues that this litigation is covered by that agreement and should be dismissed so that it can instead proceed in England. We agree and reverse the district court's decision to the contrary.

I

Farhad Azima is an international businessman who resides in Missouri.[1] RAKIA is the investment and wealth fund of one of the United Arab Emirates, Ras Al Khaimah (RAK). RAK "is the sole owner of [RAKIA]," J.A. 528, and Sheikh Saud bin Saqr al Qasimi is the current ruler of RAK. Over the years, Azima and RAKIA have entered into various business deals, three of which are relevant here. In 2007, RAKIA and HeavyLift International Airlines, one of Azima's companies, created a joint venture to build and operate a flight training academy. In 2011, RAKIA paid another of Azima's companies to identify a prospective buyer for a hotel that RAKIA owned. And from mid-2015 to July 2016, Azima helped negotiate the resolution of a dispute between RAKIA and its former Chief Executive Officer, Khater Massaad.

With regard to the Massaad negotiation, by the fall of 2015, Azima had met several times with representatives of RAKIA and RAK to discuss a settlement. Negotiations appeared to be progressing, but on October 14, 2015, Sheikh

---

[1] Because we resolve this case on *forum non conveniens* grounds at the motion to dismiss stage, we accept as true the allegations in the complaint and draw all reasonable inferences in Azima's favor. *See Shi v. New Mighty U.S. Tr.*, 918 F.3d 944, 948 (D.C. Cir. 2019).

Saud emailed Massaad to express his "disappointment" over information his law firm had uncovered about Massaad's actions. J.A. 419 ¶ 25. Despite this, the parties continued to work towards a settlement for several more months.

The Massaad negotiation was still underway in March 2016 when RAKIA agreed to settle Azima's claim that RAKIA owed HeavyLift money for investments the company had made pursuant to their joint venture (the "Settlement Agreement"). The Agreement is brief. It lists the parties, provides that RAKIA will pay HeavyLift to resolve all claims it or Azima has against RAKIA or any other entity owned by RAK, states that the parties agree to act in good faith towards one another, and imposes conditions of confidentiality and non-disparagement. Most important for present purposes are the six "Whereas" (preamble) clauses, J.A. 603, and the final section, titled "Governing law and jurisdiction," J.A. 605. The whereas clauses summarize the respective roles of RAKIA and HeavyLift in the joint venture, the basis of HeavyLift's claim against RAKIA, and other relevant background considerations. The section of the Agreement titled "Governing law and jurisdiction" provides:

> This Settlement Agreement and any dispute or claim arising out of, or in connection with, it or its subject matter or formation (including, without limitation, any contractual or non-contractual disputes, claims or obligations) is governed by and shall be construed in accordance with English law and the Parties submit to the exclusive jurisdiction of the courts of England and Wales.

J.A. 605-06. We refer to this provision as the "forum-selection clause."

Four months after executing the Settlement Agreement, the parties reached a tentative resolution in the Massaad negotiation. But when that deal later fell apart, RAKIA and its attorneys blamed Azima and threatened that he would become "'collateral damage' in the war RAKIA intended to wage against" Massaad. J.A. 421-22 ¶ 35.

Shortly after RAKIA's threat, files from Azima's computers began to appear online, including documents, messages, contacts, and photos. Unbeknownst to Azima, on October 14, 2015—the same day Sheikh Saud expressed disappointment over Massaad's actions—Azima's U.S.-based business and personal computers were hacked and infected with software that monitored their use. When Azima realized that his computers had been compromised, he changed his passwords, increased his security protocols, and hired experts to assess the damage. Eventually, he replaced the infected computers.

The hack triggered two lawsuits. First, RAKIA sued Azima in England, claiming that some of the documents made public after the hack show that Azima committed fraud against RAKIA during the hotel deal and breached the Settlement Agreement's warranty of good faith (the "English Action"). That Action is still ongoing. As part of his defense, Azima has argued that RAKIA should not be allowed to rely on stolen documents to support its claims. Separately, Azima filed this suit alleging that, by hacking his computers, RAKIA violated the Computer Fraud and Abuse Act, 18 U.S.C. § 1030, and committed the common-law torts of conversion and unfair competition.

RAKIA moved to dismiss this suit on two grounds. First, as an entity of a foreign government, it claimed immunity under the Foreign Sovereign Immunities Act (FSIA), 28 U.S.C.

§§ 1602-11. Next, RAKIA asserted that because the forum-selection clause in the Settlement Agreement requires Azima to litigate his claims in England, the court must dismiss the case for *forum non conveniens*, a common-law doctrine that requires dismissal if the plaintiff files suit in "an unsuitable court." *Forum non conveniens*, BLACK'S LAW DICTIONARY (10th ed. 2014). The district court denied RAKIA's motion on both grounds, reasoning that the FSIA's commercial activities exception stripped RAKIA of its immunity, the forum-selection clause did not apply, and dismissal for *forum non conveniens* was not otherwise warranted. *Azima v. RAK Inv. Auth.*, 305 F. Supp. 3d 149, 161-76 (D.D.C. 2018). RAKIA timely appealed.

II

Although our jurisdiction over "final decisions of the district courts" typically does not include the denial of a motion to dismiss, *United States v. Rose*, 28 F.3d 181, 185 (D.C. Cir. 1994) (quoting 28 U.S.C. § 1291), the collateral order doctrine allows us to review "[t]he denial of a motion to dismiss on the ground of sovereign immunity," *Kilburn v. Socialist People's Libyan Arab Jamahiriya*, 376 F.3d 1123, 1126 (D.C. Cir. 2004). And because the denial of RAKIA's *forum non conveniens* motion is pendent to the FSIA claim, we have jurisdiction to review that order as well. Although we exercise pendent jurisdiction sparingly, and "only when substantial considerations of fairness or efficiency demand it," *Gilda Marx, Inc. v. Wildwood Exercise, Inc.*, 85 F.3d 675, 679 (D.C. Cir. 1996) (per curiam), RAKIA's *forum non conveniens* argument satisfies these requirements. Exercising pendent jurisdiction over a threshold issue in an FSIA case is appropriate where "pendent review will likely terminate the entire case, sparing both this court and the district court from further proceedings and giving the parties a speedy resolution."

*Id.*; *see Sinochem Int'l Co. v. Malaysia Int'l Shipping Corp.*, 549 U.S. 422, 433 (2007) (explaining that *forum non conveniens* is a "threshold, nonmerits issue"); *see also Jungquist v. Sheikh Sultan Bin Khalifa Al Nahyan*, 115 F.3d 1020, 1026-27 (D.C. Cir. 1997) (exercising pendent jurisdiction to consider a personal jurisdiction issue in an FSIA case that could dispose of the case); *Rendall-Speranza v. Nassim*, 107 F.3d 913, 917 (D.C. Cir. 1997) (same, for statute of limitations).

III

A

Because "[t]here is a 'substantial presumption' in favor of a plaintiff's chosen forum," lawsuits usually proceed where they are filed. *MBI Grp., Inc. v. Credit Foncier Du Cameroun*, 616 F.3d 568, 571 (D.C. Cir. 2010) (quoting *Agudas Chasidei Chabad of U.S. v. Russian Fed'n*, 528 F.3d 934, 950 (D.C. Cir. 2008)). But if the plaintiff has entered into a contract to litigate his claims in a specific forum, the defendant may enforce that agreement by moving to dismiss for *forum non conveniens*. As long as the forum-selection clause is applicable, mandatory, valid, and enforceable, the court must almost always grant the motion to dismiss. *See Atl. Marine Constr. Co. v. U.S. Dist. Court for W.D. Tex.*, 571 U.S. 49, 62 n.5, 63-65 (2013). The reason is simple: when a plaintiff has agreed in advance to litigate future claims in a specific venue, we will enforce—and give deference to—that contractual choice.

A clause is applicable if its scope encompasses the dispute, which we assess using normal principles of contract interpretation. It is mandatory if it requires that litigation proceed in a specific forum. By contrast, "a permissive clause permits litigation to occur in a specified forum but does not bar

litigation elsewhere." *BAE Sys. Tech. Sol. & Servs., Inc. v. Republic of Korea's Def. Acquisition Program Admin.*, 884 F.3d 463, 470 (4th Cir. 2018). We presume that a mandatory forum-selection clause is legally valid and enforceable absent a "strong showing" that (1) "the clause was invalid for such reasons as fraud or overreaching"; (2) "enforcement would be unreasonable and unjust"; (3) "enforcement would contravene a strong public policy of the forum in which [the plaintiff filed suit], whether declared by statute or judicial decision"; or (4) "trial in the contractual forum would be so gravely difficult and inconvenient that [the plaintiff] will for all practical purposes be deprived of his day in court." *M/S Bremen v. Zapata Off–Shore Co.*, 407 U.S. 1, 15, 18 (1972).

If the forum-selection clause does not meet these criteria, we use the typical *forum non conveniens* analysis, and the defendant must show that the case can and should proceed elsewhere, meaning another forum is (1) "available and adequate" to litigate the plaintiff's claims and, (2) "upon a weighing of public and private interests, the strongly preferred location for the litigation." *MBI Grp.*, 616 F.3d at 571. But if we are dealing with an applicable, mandatory, valid, and enforceable forum-selection clause, we need not ask whether the location it identifies is available, adequate, or best for the parties' private interests. They have already told us that it meets these criteria: By agreeing to litigate there, the parties consented to be subject to service of process in that forum, meaning it is available. *Wong v. PartyGaming Ltd.*, 589 F.3d 821, 831 (6th Cir. 2009); *see Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 506-07 (1947). And because the clause "represents the parties' agreement as to the most proper forum," we can assume that they selected one adequate to litigate their claims and to protect their private interests. *See Atl. Marine*, 571 U.S. at 63-64 (quoting *Stewart Org., Inc. v. Ricoh Corp.*, 487 U.S.

22, 31 (1988)).[2] If the preselected forum is substantially deficient—for instance, because it is effectively inaccessible or unable to afford the plaintiff any relief—then the clause is not enforceable. *See, e.g.*, *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 254 & n.22 (1981) (a forum is inadequate if the remedy offered is "clearly unsatisfactory"); *Weber v. PACT XPP Techs., AG*, 811 F.3d 758, 774 (5th Cir. 2016) (a forum-selection clause is unenforceable if there is no available cause of action in the preselected forum that can afford the plaintiff any relief).

That leaves only one question: can the plaintiff show that the public interest associated with litigating elsewhere outweighs all of the private interests that their agreement presumably took into account? *See Atl. Marine*, 571 U.S. at 67 ("As the party acting in violation of the forum-selection clause, [the plaintiff] must bear the burden of showing that public-interest factors overwhelmingly disfavor a transfer."). The public-interest factors include administrative convenience, the interest in deciding local controversies at home, judicial economy, familiarity with applicable law, and the desire to

---

[2] Most courts do not discuss whether the location identified in an applicable, mandatory, valid, and enforceable forum-selection clause is available or adequate. *See, e.g.*, *Kelvion, Inc. v. PetroChina Canada Ltd.*, 918 F.3d 1088, 1092-94 (10th Cir. 2019). And although some courts have left open the possibility that they will consider whether the preselected forum meets these criteria, none have explained why that inquiry would be necessary. *See Aviation One of Fla., Inc. v. Airborne Ins. Consultants (PTY), Ltd.*, 722 F. App'x 870, 885 (11th Cir. 2018) (per curiam); *Collins v. Mary Kay, Inc.*, 874 F.3d 176, 186 (3d Cir. 2017); *Stiles v. Bankers Healthcare Grp., Inc.*, 637 F. App'x 556, 559 (11th Cir. 2016) (per curiam); *Pappas v. Kerzner Int'l Bahamas Ltd.*, 585 F. App'x 962, 967 (11th Cir. 2014) (per curiam); *Dahman v. Embassy of Qatar*, 364 F. Supp. 3d 1, 8 (D.D.C. 2019).

avoid imposing jury duty on a community unconnected to the litigation. *See Sinochem*, 549 U.S. at 435-36; *Piper Aircraft Co.*, 454 U.S. at 241 n.6. Only in the most "unusual" or "rare[]" case will the strength of these factors warrant "disrupt[ing] the parties' settled expectations" as reflected in the forum-selection clause. *Atl. Marine*, 571 U.S. at 64, 66.

We review de novo whether the forum-selection clause is applicable, mandatory, valid, and enforceable, then review for abuse of discretion the weighing of the public- and private-interest factors. *Kelvion, Inc. v. PetroChina Canada Ltd.*, 918 F.3d 1088, 1092 (10th Cir. 2019); *Weber*, 811 F.3d at 768; *see also Bode & Grenier, LLP v. Knight*, 808 F.3d 852, 862 (D.C. Cir. 2015) (contract interpretation); *Piper Aircraft Co.*, 454 U.S. at 257 (*forum non conveniens*).

B

Azima filed suit in the United States, but RAKIA moved to dismiss for *forum non conveniens* because the parties had executed a forum-selection clause that states, in relevant part, "This Settlement Agreement and any dispute or claim arising out of, or in connection with, it or its subject matter or formation . . . is governed by and shall be construed in accordance with English law and the Parties submit to the exclusive jurisdiction of the courts of England and Wales." J.A. 605-06. The clause is mandatory because it provides for "exclusive jurisdiction" in England and Wales. *See, e.g.*, *Phillips v. Audio Active Ltd.*, 494 F.3d 378, 386 (2d Cir. 2007). The parties do not dispute the clause's validity or enforceability. *Compare* RAKIA Br. 30 ("The parties have entered into a mandatory, enforceable forum selection agreement . . . ."), *with* Azima Br. 42-48 (arguing the clause is not "controlling," but not that it is unenforceable or invalid). We note, however, that it appears RAKIA might be entitled to

sovereign immunity in England, the preselected forum. *See Azima*, 305 F. Supp. 3d at 173-74 (explaining that if RAKIA did not consent to waive immunity in England with respect to Azima's claims in this lawsuit, that might leave Azima without a forum to litigate this dispute). Even if some courts might be hesitant to enforce a forum-selection clause in that circumstance, the issue does not pose a problem here. At oral argument, RAKIA agreed to waive its sovereign immunity if Azima brings a counterclaim for damages in the English Action. Tr. of Oral Arg. at 3:23-5:12.

That brings us to whether the clause applies to this dispute, an issue we resolve using general principles of contract law. Although the Settlement Agreement is governed by English law, the parties' briefs "make little reference to English contract law." *John Wyeth & Bro. Ltd. v. CIGNA Int'l Corp.*, 119 F.3d 1070, 1074 (3d Cir. 1997) (Alito, J.); *see* RAKIA Br. 56-59 (citing only the record in support of this analysis); Azima Br. 42-48 (citing the record and opinions from other circuits applying general contract law); RAKIA Reply Br. 5 (citing one English contract case for the proposition that we should construe the forum-selection clause broadly). We therefore "assume that they do not rely on any distinctive features of English law," and will "base our decision on general contract law principles." *John Wyeth*, 119 F.3d at 1074.

The Agreement's forum-selection clause applies to "any dispute or claim arising out of, or in connection with, [the Agreement] or its subject matter or formation." J.A. 605. Like the district court, we have little trouble concluding that the "subject matter" of the Agreement includes only the joint venture. *See Azima*, 305 F. Supp. 3d at 175. The "subject matter" of a contract is "[t]he issue presented for consideration" or "the thing in dispute." *Subject Matter*, BLACK'S LAW DICTIONARY. The Agreement resolves a dispute

between RAKIA and HeavyLift over outstanding payments related to their joint venture. It provides that RAKIA will pay HeavyLift in exchange for the release of any unresolved claims Azima or HeavyLift has against RAKIA or its affiliates, and five of the six whereas clauses mention HeavyLift or the joint venture. It is clear to us that the dispute related to the joint venture formed the crux of this Agreement.

RAKIA argues that the subject matter of the Agreement is broader. In its view, "At the very least, the 'subject matter' of the Settlement Agreement must include those topics expressly mentioned in the document," and because the fifth whereas clause mentions the Massaad negotiation, that too is part of the Agreement's subject matter. RAKIA Reply Br. 5; *see* J.A. 603 (stating in fifth whereas clause that "Mr. Azima has recently provided negotiation assistance to RAKIA on an informal basis which RAKIA recognises and appreciates"). We cannot agree. The mere mention of an event does not make it the "thing in dispute."

But that does not end our inquiry, for the forum-selection clause also applies to claims arising from the Agreement's "formation." J.A. 605. Although the district court and parties did not address the scope of this word, where possible, we must give meaning to every contract term. *See* RESTATEMENT (SECOND) OF CONTRACTS §§ 202, 203 (AM. LAW INST. 1981). "Formation" here refers to the process during which something develops or is created, *i.e.*, the background considerations against which the parties entered into this Agreement. *See Formation*, WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 893 (2002) ("the manner in which a thing is formed"); *Formation*, 6 OXFORD ENGLISH DICTIONARY 85 (2d ed. 1989) ("The action or process of forming; a putting or coming into form; creation, production.").

Read in context, the fifth whereas clause provides one such background consideration. *See* 17A AM. JUR. 2D CONTRACTS § 373 (2019) (whereas clauses indicate the parties' purposes and motives, and help determine intent). Clause four states that "RAKIA does not agree that there is any legal basis for [HeavyLift's] claim." J.A. 603. Clause five explains that "Azima has recently provided . . . assistance to RAKIA on an informal basis" in the Massaad negotiation, "which RAKIA recognises and appreciates." *Id.* Clause six says that the parties now "wish[] to resolve all outstanding issues" related to the joint venture. *Id.* According to this series of clauses, RAKIA did not think HeavyLift had a claim and so did not want to settle, but was willing to do so in recognition of Azima's help with the Massaad negotiation.

By its plain terms, the Settlement Agreement therefore requires Azima to litigate in England any "dispute or claim arising out of, or in connection with," the Agreement itself, the outstanding claims from the joint venture, or the Massaad negotiation's role in the Agreement's formation. J.A. 605. As we explain, this case qualifies as such a dispute.

We begin by defining "in connection with." This phrase is equivalent to "in relation to," which is quite broad. *Coregis Ins. Co. v. Am. Health Found., Inc.*, 241 F.3d 123, 128-29 (2d Cir. 2001) (Sotomayor, J.). As then-Judge Alito explained, "a dispute 'arise[s] . . . in relation to'" an agreement if "the origin of the dispute is related to that agreement," meaning it "has some 'logical or causal connection'" to the agreement. *John Wyeth*, 119 F.3d at 1074 (alterations in original) (quoting WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1916 (1971)); *accord Yei A. Sun v. Advanced China Healthcare, Inc.*, 901 F.3d 1081, 1086 (9th Cir. 2018); *Huffington v. T.C. Grp., LLC*, 637 F.3d 18, 22 (1st Cir. 2011); *Chelsea Family*

*Pharmacy, PLLC v. Medco Health Sols., Inc.*, 567 F.3d 1191, 1199 (10th Cir. 2009).

Azima recognizes that "in connection with" is often defined broadly, but he asserts that "a claim 'relates to' or is 'in connection with' *a contract* only when 'the dispute occurs as a fairly direct result of the performance of contractual duties.'" Azima Br. 43 (emphasis added) (quoting *Bailey v. ERG Enters., LP*, 705 F.3d 1311, 1317 (11th Cir. 2013)); *see* Azima Br. 44 (citing *Necchi S.p.A. v. Necchi Sewing Mach. Sales Corp.*, 348 F.2d 693, 696-97 (2d Cir. 1965), which held that a clause that applied to disputes "arising out of or in connection with [the agreement]" covered disputes that were "directly relate[d] to certain provisions in the agreement" (footnote omitted)). Absent this, he argues, "relate to" would have no limits. Azima Br. 43-44.

That proposed definition is too narrow. The forum-selection clause applies to claims arising from the Agreement *and* from its subject-matter or formation, not just claims connected to the "contract." More fundamentally, although we agree that "in connection with" is quite broad, we fail to see why that requires us to limit its scope. If the parties had wished to mark a narrower boundary for this forum-selection clause, they could have easily done so. They might have restricted the clause to disputes "arising out of, or in connection with," the Settlement Agreement *itself*, as Azima suggests. They could have omitted "in connection with," which sweeps more broadly than "arising out of." *Coregis Ins. Co.*, 241 F.3d at 128-29 (collecting cases). Or the parties could have limited the clause to future "claims," a term narrower than "disputes." *In re McGraw-Hill Glob. Educ. Holdings LLC*, 909 F.3d 48, 67 (3d Cir. 2018); *see Abbott Labs. v. Takeda Pharm. Co.*, 476 F.3d 421, 424 (7th Cir. 2007). In the most restrictive tack, they might have combined all three and stipulated that only claims

arising out of the Settlement Agreement itself are subject to the forum-selection clause. They did not, and we must do our best to give meaning to every word and phrase they did use. RESTATEMENT (SECOND) OF CONTRACTS §§ 202, 203.

Azima's claims "connect[] with" the "formation" of the Agreement through the Massaad negotiation. Indeed, Azima conceded as much in his brief, stating "the hacking of Azima's computers, the theft of his data, . . . and the extortion of Azima were done *in connection with* the regular course of commercial activity between Azima and RAKIA generally, *and the mediation services Azima was providing for RAKIA's mediation with its former CEO specifically*." Azima Br. 44-45 (emphases added) (citing J.A. 429 ¶ 64). Those services are one reason the parties entered into the Settlement Agreement. The allegations in his complaint back up this assertion. It states that Azima's computers were hacked the "same day" that Sheikh Saud expressed disappointment over Massaad's actions, J.A. 419 ¶ 25, and suggests that RAKIA hacked his computers because it "blamed [him] for the lack of a settlement between RAKIA and" Massaad and wanted to make Azima "'collateral damage' in the war RAKIA intended to wage against" Massaad, J.A. 421-22 ¶¶ 34-35. If Azima had not been involved in the Massaad negotiation, the parties may not have executed the Settlement Agreement, RAKIA could not have "blamed [him] for the lack of a settlement" with Massaad, and RAKIA would not have needed to make Azima "collateral damage." These allegations adequately link the negotiation (and thus the Agreement) to Azima's hacking, conversion, and unfair competition claims: the Massaad negotiation prompted the hack, which violated Azima's privacy, deleted his data, forced

him to replace his computers, and interfered with his business interests.[3]

Azima resists this conclusion, *see* Azima Br. 43-47, but the three cases he points to are easily distinguishable for "whether or not a [forum-selection] clause applies depends on what the *specific clause at issue* says. Drawing analogy to other cases is useful only to the extent those other cases address contract language that is the same or substantially similar to that at issue." *John Wyeth*, 119 F.3d at 1075. The clause at issue in the first case, *Necchi*, required the parties to arbitrate "[a]ll matters, disputes or disagreements arising out of or in connection with" the agreement itself, but not its subject matter or formation. 348 F.2d at 695. The other two—*Doe v. Princess Cruise Lines, Ltd.*, 657 F.3d 1204 (11th Cir. 2011), and *Jones v. Halliburton Co.*, 583 F.3d 228 (5th Cir. 2009)—held that clauses requiring arbitration of all claims "related to" one's employment did not apply to claims stemming from alleged rapes by company employees that occurred in employer-provided housing (a non-work space) while the victim was off-duty, following an after-hours social gathering. Both *Doe* and *Jones* reasoned that "relate to" must have some limits, and quoted the Supreme Court's caution that "really, universally, relations stop nowhere." *Doe*, 657 F.3d at 1218-19 (quoting *N.Y. State Conf. of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645, 655 (1995)); *Jones*, 583 F.3d at 238-39. Of course "relate to" is not unlimited, but our conclusion here is hardly akin to saying that a rape-related claim is within the scope of one's employment simply because the rape occurred on employer-owned property. It is not a stretch to conclude that

---

[3] Because Azima's claims "connect with" the Massaad negotiation, we need not address whether his claims "connect with" the joint venture or any other aspect of the Settlement Agreement, including whether the gravamen of Azima's unfair competition claim is a violation of the Agreement's non-disparagement clause.

"any dispute arising in connection with the agreement's formation" includes claims that the plaintiff himself admitted were connected to an event explicitly mentioned as leading to the agreement's formation.

In sum, the forum-selection clause is mandatory and applies to Azima's claims, and the parties do not dispute that the clause is valid and enforceable. This case must therefore proceed in England, unless Azima has carried the heavy burden required to show that, based on the public-interest factors alone, this case should instead proceed here. *Atl. Marine*, 571 U.S. at 64.

The district court's approach was flawed in several respects. Most fundamentally, the court erroneously placed the burden on RAKIA to show that dismissal *was* warranted. *Azima*, 305 F. Supp. 3d at 175-76; *see Atl. Marine*, 571 U.S. at 63 ("[A]s the party defying the forum-selection clause, the plaintiff bears the burden of establishing that transfer to the forum for which the parties bargained is unwarranted."). The district court also concluded that, "to the extent that RAKIA has failed to establish that" England is an adequate, available forum, the forum-selection clause is "irrelevant." *Azima*, 305 F. Supp. 3d at 175. But the presence of a qualifying forum-selection clause means that we need not determine whether England meets these criteria. *See supra* III.A. Furthermore, the court found that, "even if [it] was to proceed to" consider the public and private interests, "RAKIA has not demonstrated that the balance of [these] factors has 'a strong tilt towards a particular forum.'" *Azima*, 305 F. Supp. 3d at 175-76 (quoting *EIG Energy Fund XIV, L.P. v. Petróleo Brasileiro S.A.*, 246 F. Supp. 3d 52, 74 (D.D.C. 2017)). Again, Azima bore that burden, and the district court was required to "deem the private-interest factors to weigh entirely in favor of the preselected forum." *Atl. Marine*, 571 U.S. at 64.

Despite these errors, we see no need to remand for the district court to redo its analysis. As we have explained, it is clear that Azima bore the burden to show that, based on the public-interest factors, transfer to England was unwarranted. *Id.* at 63-64. But the few public-interest factors that he raised before the district court cannot defeat the forum-selection clause. Azima argued that because he is a U.S. citizen bringing a claim about activities that occurred here in violation of a U.S. statute, his case belongs in a U.S. court. The public does have an interest in keeping U.S.-based disputes that turn on U.S. law in our courts. *See Piper Aircraft Co.*, 454 U.S. at 241 n.6. But familiarity with the applicable law is also part of the public interest inquiry, *see id.*, and the Settlement Agreement provides that English Law will govern all disputes subject to the forum-selection clause. Moreover, judicial economy and administrative convenience point towards resolving the parties' U.S. and U.K. claims in the same forum. *See id.*; *see also Sinochem*, 549 U.S. at 435-36.

Simply put, this is not the "rare[]," "unusual," or "[un]common" case in which the public-interest factors defeat a forum-selection clause. *Atl. Marine*, 571 U.S. at 64. Few are, and they are factually distinct and do not bind our court.[4]

---

[4] *See, e.g.*, *Anthony Allega Cement Contractor, Inc. v. Johnson Controls Fed. Sys./Versar, LLC*, No. 18-cv-875, 2019 WL 1792201, at *11 (D. Del. Apr. 24, 2019) (denying a motion to transfer to the forum designated in a valid forum-selection clause because the clause bound only some parties, and transferring only some claims would result in duplicative and inefficient litigation); *Seaman v. Private Placement Capital Notes II, LLC*, No. 16-cv-00578, 2017 WL 1166336, at *6-7 (S.D. Cal. March 29, 2017) (same, because the case stemmed from an SEC enforcement action initiated in California, the largest number of defrauded investors were located in California, and transferring the case would undermine the decisions

Where a case or legal issue is so clear that a contrary ruling would constitute an abuse of discretion, there is no need to remand to the district court. *Summers v. Howard Univ.*, 374 F.3d 1188, 1194-95 (D.C. Cir. 2004); *Al-Fayed v. CIA*, 254 F.3d 300, 309 n.10 (D.C. Cir. 2001). Accordingly, we exercise our pendent jurisdiction and reverse the denial of RAKIA's motion to dismiss on *forum non conveniens* grounds. *See Jungquist*, 115 F.3d at 1032-33 (reversing denial of motion to dismiss on pendent review because district court lacked personal jurisdiction over the defendant); *Rendall-Speranza*, 107 F.3d at 920-21 (same, on statute of limitations grounds). Because we reverse on *forum non conveniens* grounds, we do not reach the question of whether dismissal was warranted under the FSIA. *See Sinochem*, 549 U.S. at 425, 432.

IV

The decision of the district court denying RAKIA's motion to dismiss is reversed.

*So ordered.*

---

the court had made in the enforcement action); *Cmty. Voice Line, L.L.C. v. Great Lakes Commc'n Corp.*, No. 12-cv-4048, 2014 WL 3102124, at *4-5 (N.D. Iowa July 7, 2014) (same, for a motion to dismiss because the controversy was local to Iowa, it would be unfair to burden another jury with this case, and judicial economy favored keeping all claims and counterclaims together in Iowa).