# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

ALBEMARLE CORPORATION;
ALBEMARLE INTERNATIONAL
CORPORATION,

          *Plaintiffs-Appellants,*

          v.

ASTRAZENECA UK LTD,

          *Defendant-Appellee.*

No. 10-1000

Appeal from the United States District Court
for the District of South Carolina, at Orangeburg.
Margaret B. Seymour, District Judge.
(5:08-cv-01085-MBS)

Argued: September 21, 2010

Decided: December 8, 2010

Before NIEMEYER and KING, Circuit Judges, and
Robert J. CONRAD, Jr., Chief United States District Judge
for the Western District of North Carolina,
sitting by designation.

Affirmed by published opinion. Judge Niemeyer wrote the
opinion, in which Judge King and Judge Conrad joined.

## COUNSEL

**ARGUED**: Charles Mitchell Brown, NELSON MULLINS
RILEY & SCARBOROUGH, Columbia, South Carolina, for
Appellants. Raymond A. Cardozo, REED SMITH LLP, San
Francisco, California, for Appellee. **ON BRIEF**: William C.
Wood, Jr., Elizabeth H. Campbell, NELSON MULLINS
RILEY & SCARBOROUGH, Columbia, South Carolina, for
Appellants. S. Miles Dumville, Travis A. Sabalewski, REED
SMITH LLP, Richmond, Virginia; Jacquelyn D. Austin,
Keith D. Munson, WOMBLE CARLYLE SANDRIDGE &
RICE, Greenville, South Carolina, for Appellee.

## OPINION

NIEMEYER, Circuit Judge:

In this case, we address how to interpret a forum selection
clause that makes an international contract "subject to juris-
diction" in the United Kingdom.

AstraZeneca UK Ltd., a United Kingdom corporation,
agreed in a 2005 contract to purchase a substantial portion of
its needs for di-isopropyl-phenol ("DIP") from Albemarle
International Corporation, a Virginia corporation. Albemarle
International Corporation was the global marketing arm of
Albemarle Corporation, a Virginia corporation (both corpora-
tions, collectively "Albemarle"), and Albemarle Corporation
manufactured DIP in its plant in South Carolina. AstraZeneca
used DIP to manufacture the drug Diprivan, a fast-acting
anesthetic, at its plant in England. In the 2005 contract, Astra-
Zeneca also agreed that if it ceased using DIP in favor of
propofol, a derivative of DIP, it would give Albemarle the
right of first refusal to supply AstraZeneca with propofol.
When AstraZeneca did elect a year later to use propofol in
lieu of DIP, Albemarle contends that AstraZeneca breached

its duty to give Albemarle the right of first refusal, and Albemarle commenced this action in South Carolina, alleging that AstraZeneca breached the 2005 contract.

Based on a forum selection clause in the 2005 contract, which provided that the contract was "subject to" the jurisdiction of the English High Court, AstraZeneca filed a motion to dismiss this action for improper venue. The district court granted the motion and dismissed the complaint, applying English law, which the contract specified was applicable, to hold that the forum selection clause was mandatory and exclusive, even though such a clause would likely be construed under federal case law to be permissive.

We affirm. Resting on the traditional proposition that we should give effect to parties' expectations as manifested in their legitimate agreements, we apply English law to construe the forum selection clause and conclude that under English law, the clause requires that this litigation be pursued in the designated English court. We also conclude that enforcing the forum selection clause in this manner is not unreasonable, as unreasonableness is detailed in *The Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1, 15-18 (1972).

I

In the contract, which is dated April 11, 2005, AstraZeneca agreed to purchase at least 80% of its requirements for DIP from Albemarle. To manufacture Diprivan, AstraZeneca distilled the DIP to obtain propofol, the active ingredient in Diprivan. In the 2005 contract AstraZeneca agreed that if it decided to bypass its own distilling process and purchase propofol directly for its manufacturing of Diprivan, it would give Albemarle the right of first refusal to sell AstraZeneca propofol "under mutually acceptable terms and conditions."

About a year later, in June 2006, AstraZeneca notified Albemarle that it intended to cease purchasing DIP and

instead to purchase propofol directly from a third party. After AstraZeneca provided Albemarle with a copy of its purchase agreement with the third party and Albemarle made a competing offer to sell propofol to AstraZeneca, AstraZeneca refused to purchase propofol from Albemarle.

Albemarle commenced this breach of contract action against AstraZeneca in the Court of Common Pleas in Orangeburg, South Carolina, and AstraZeneca, invoking diversity jurisdiction, removed the case to federal court. AstraZeneca then filed a motion to dismiss for improper venue, relying on Federal Rules of Civil Procedure 12(b)(3) and 12(b)(6), along with 28 U.S.C. § 1406(a). In support of its motion, AstraZeneca pointed to the choice of law and forum selection clauses which provided simply that the contract "shall be subject to English Law and the jurisdiction of the English High Court." In response to the motion, Albemarle argued that the forum selection clause was only permissive and did not exclude a South Carolina court as an appropriate forum. It also filed a motion seeking to enjoin AstraZeneca from pursuing litigation concerning the contract in England.

While this litigation was pending, AstraZeneca and Albemarle entered into a new contract dated June 23, 2008, under which AstraZeneca agreed to a one-time purchase of DIP from Albemarle. In this contract, the parties agreed to apply South Carolina law and to litigate disputes exclusively in a South Carolina court. Based on an integration clause in the 2008 contract, as well as its forum selection clause, Albemarle argued to the district court that the 2008 contract superseded the 2005 contract, including the 2005 contract's choice of law and forum selection clauses.

In an opinion dated March 31, 2009, the district court agreed with Albemarle and denied AstraZeneca's motion to dismiss, finding that federal law applied in construing the forum selection clause in the 2005 contract and that, under federal law, this form of forum selection clause was only per-

missive and not exclusive. The court also entered an injunction barring AstraZeneca from pursuing claims on the 2005 contract in England. Because it determined that the forum selection clause of the 2005 contract was permissive, the court concluded that it need not "determine whether the [2008] Contract supersede[d] the [2005] contract."

Six months later, however, the district court granted Astra-Zeneca's motion for reconsideration and then granted its motion to dismiss. The court also vacated its injunction and denied all remaining motions as moot. The court stated that earlier it had "not address[ed] Defendant's argument regarding the application of English law in ruling on the motion to dismiss." The court concluded that its prior order "should be vacated and Defendant's motion to dismiss granted." It reasoned that English law applied and that under English law "the forum selection clause is mandatory." It also concluded that enforcing the forum selection clause would not violate any "strong public policy" of South Carolina. By a later order on Albemarle's motion for reconsideration, the court ruled that the 2008 contract did not supersede the 2005 contract.

From the district court's order of dismissal, dated September 9, 2009, Albemarle took this appeal.

II

Albemarle contends first that the 2008 contract displaced and nullified the 2005 contract and, in doing so, replaced the 2005 contract's forum selection clause with the forum selection clause in the 2008 contract, which designated any state or federal court in or near Orangeburg, South Carolina as having "exclusive jurisdiction and venue." To make this argument, Albemarle relies on both the integration clause and the forum selection clause contained in the 2008 contract.

The subject of the 2008 contract was AstraZeneca's one-time purchase of 9,253 kilograms of DIP, to be delivered "on

or before June 27, 2008 provided it is after execution of the contract by the parties and payment received by Albemarle." There were no other substantive terms in the 2008 contract other than to clarify that the contract "shall commence on June 10, 2008, and terminate on June 30, 2008." The "General Conditions of Sale," incorporated into the 2008 contract, included the integration and forum selection clauses, on which Albemarle relies. The integration clause provided:

> This Agreement constitutes the entire contract of sale and purchase of the product(s) named herein. *All prior agreements between the parties relating to this product, if any are currently in force or effect, shall have no further force or effect, except to the extent relied upon by Seller* (or any subsidiary of Seller) as forming the basis of relief sought by Seller (or any subsidiary of Seller) against Buyer in current or future litigation between Buyer and Seller (or any subsidiary of Seller). The terms of this Agreement shall not, in the absence of prior express written consent of the parties, be amended, supplemented or superseded by any terms or provisions of any purchase order, invoice or other document of any kind.

(Emphasis added). And the forum selection clause, which also included a choice of law provision, provided:

> This Agreement shall be interpreted in accordance with the laws of South Carolina, without giving effect to provisions as to the conflicts of laws. Any disputes relating in any way to this agreement will be resolved in the state or federal court located in (or if none is located in, then the nearest to) Orangeburg, South Carolina, *which court will have exclusive jurisdiction and venue over such dispute*.

(Emphasis added). Albemarle argues that this language in the 2008 contract "terminated any and all rights then being

asserted under the 2005 Contract by AstraZeneca or by Albemarle, including rights under the choice of law and venue provision of the 2005 contract."

We find this argument inconsistent with Albemarle's litigating posture and, in any event, not supported by the contractual language of the 2008 contract. First, Albemarle suggests that all rights under the 2005 contract were terminated, excepting any "prior agreements . . . to the extent relied on by [Albemarle]." But this language, on which Albemarle relies to preserve its claim for breach of its right of first refusal, can hardly be employed to preserve a right in the 2005 contract without including the conditions attached to that right. And, of course, those conditions state that the right is to be considered under English law and is to be litigated in an English court.

Second, while the 2008 contract does provide that all prior contracts in force as of June 23, 2008 (when the 2008 contract was signed) "shall have no *further* force or effect" (emphasis added), that language clearly evidences only a termination as of that time, June 23, 2008, of any contractual rights and obligations that may have survived from the 2005 contract. Thus, from the moment the parties signed the 2008 contract, the 2005 contract no longer bound the parties. But the 2005 contract's *prior* force or effect was not eliminated by a clause stating that it have no *further* force or effect. The use of the word "further" is forward-looking and does not purport to undo and nullify all prior sales made under the 2005 contract, all warranties given, all obligations incurred, and all claims arising from those sales obligations, much less pending litigation based on earlier breaches of the 2005 contract.

Finally, the language in the 2008 contract does not purport to release any or all claims arising out of the 2005 contract. Before the 2005 contract was terminated by the language in the 2008 contract, the parties treated the 2005 contract as a valid enforceable contract that created benefits for and

imposed duties on the parties. There is no language in the 2008 contract rendering those benefits and duties null nunc pro tunc.

We readily conclude that the 2008 contract does not affect the issues presented in this case.

III

For its principal argument, Albemarle contends that the district court erred in enforcing the forum selection clause under English law rather than under American federal common law. It argues that federal law applies because seeking to enforce a forum selection clause in a federal court implicates venue rules and statutes that are part of the federal law, as, for example, Federal Rule of Civil Procedure 12(b)(3), 28 U.S.C. § 1391, and 28 U.S.C. § 1406(a). *See Wong v. PartyGaming Ltd.*, 589 F.3d 821, 827 (6th Cir. 2009) (noting that six circuits have held that "the enforceability of a forum selection clause implicates federal procedure and should therefore be governed by federal law," and adopting that rule); *Manetti-Farrow, Inc. v. Gucci America, Inc.*, 858 F.2d 509, 513 (9th Cir. 1988) ("[B]ecause enforcement of a forum clause necessarily entails interpretation of the clause before it can be enforced, federal law also applies to interpretation of forum selection clauses"). It then continues with its argument that under federal law the general maxim is that "an agreement conferring jurisdiction in one forum will not be interpreted as excluding jurisdiction elsewhere unless it contains specific language of exclusion." *IntraComm, Inc. v. Bajaj*, 492 F.3d 285, 290 (4th Cir. 2007) (emphasis omitted) (*quoting John Boutari & Son, Wines & Spirits, S.A. v. Attiki Imp. & Distrib., Inc.*, 22 F.3d 51, 53 (2d Cir. 1994)). In sum, Albemarle asserts that federal law would hold that a forum selection clause, as written in the 2005 contract—providing that the contract is "subject to . . . the jurisdiction of the English High Court"—*permits* the English court to entertain the case but does not

*require* that the litigation take place there, because the language does not exclude other jurisdictions and forums.

AstraZeneca agrees that federal law applies when a federal court construes a forum selection clause, but it argues that federal law also requires that a court give effect to the parties' intent as expressed in the parties' choice of law. *See Sterling Forest Assoc., Ltd. v. Barnett-Range Corp.*, 840 F.2d 249, 251 (4th Cir. 1988) (analyzing parties' intent to hold that forum selection clause mandated bringing the action in California); *Yakin v. Tyler Hill Camp, Inc.*, 566 F.3d 72, 76 (2d Cir. 2009) ("[W]e are obliged to give effect to the parties' intentions regarding venue"); *Mazda Motors of Am., Inc. v. M/V Cougar ACE*, 565 F.3d 573, 580 (9th Cir. 2009) (same). It observes that since the parties specified that English law was to apply, the forum selection clause must be taken as English law would construe it, and that, under English law, the English forum is mandatory, not permissive. *See Yavuz v. 61 MM, Ltd.*, 465 F.3d 418, 431 (10th Cir. 2006) (holding that the law that the parties chose to govern the contract should be applied to construe a forum selection clause in that contract).

We find much of the parties' discussion is unhelpful. Albemarle largely addresses naked forum selection clauses where no choice of law is indicated. AstraZeneca, by contrast, collapses the analysis of the forum selection clause with the discussion of the choice of law clause. While the parties do not appear to be in any serious disagreement about the controlling legal principles, they do disagree over the analysis to be undertaken. We analyze this contract as one that contains both a choice of law clause and a forum selection clause.

We begin by noting that when parties to a contract confer jurisdiction and venue on a particular court, as a general matter federal common law directs courts to favor enforcement of the agreement, so long as it is not unreasonable. *See The Bremen*, 407 U.S. at 10. "Forum-selection clauses [had] historically not been favored by American courts" because the effect

of enforcing them "was to 'oust the jurisdiction' of the court." *Id.* at 9. This historical reluctance to enforce such clauses was not unlike the historical reluctance to enforce arbitration clauses. *See*, *e.g.*, *Scherk v. Alberto-Culver Co.*, 417 U.S. 506, 519 (1974) (observing that an agreement to arbitrate is in effect a type of forum selection clause). Rejecting the historical judicial bias and giving effect to privately negotiated agreements, the *Bremen* Court held:

> Thus, in the light of present-day commercial realities and expanding international trade we conclude that the forum clause should control absent a strong showing that it should be set aside. . . . The correct approach would have been to enforce the forum clause specifically unless Zapata could clearly show that enforcement would be unreasonable and unjust, or that the clause was invalid for such reasons as fraud or overreaching.

*The Bremen*, 407 U.S. at 15.

Even though *The Bremen* was an admiralty case, its rationale is applicable to forum selection clauses generally. *See*, *e.g.*, *Bryant Elec. Co. v. City of Fredericksburg*, 762 F.2d 1192, 1196 (4th Cir. 1985) ("[T]his Court has applied [*The Bremen*'s] reasoning in diversity cases not involving international contracts"); *Mercury Coal & Coke, Inc. v. Mannesmann Pipe & Steel Corp.*, 696 F.2d 315, 317-18 (4th Cir. 1982); *see also Stewart Org., Inc. v. Ricoh*, 487 U.S. 22, 33 (1988) (Kennedy, J., concurring) ("Although our opinion in *The Bremen* involved a Federal District Court sitting in admiralty, its reasoning applies with much force to federal courts sitting in diversity" (internal citation omitted)).

These cases apply federal common law favoring the enforcement of forum selection clauses when interpreting contracts that contain forum selection clauses, because forum selection clauses implicate the appropriate venue of a court.

The appropriate venue of an action is a procedural matter that is governed by federal rule and statutes. *See*, *e.g.*, Fed. R. Civ. P. 12(b)(3); 28 U.S.C. § 1391; 28 U.S.C. § 1406(a); *see also Manetti-Farrow*, 858 F.2d at 513 (noting that federal law was enacted to address venue, and applying state law concerning venue would render the federal law "nugatory"); *cf. Stewart*, 487 U.S. at 32 (holding that 28 U.S.C. § 1404(a), which governs the transfer of venue among federal courts, is "doubtless capable of classification as a procedural rule"). Thus, when a court is analyzing a forum selection clause, which changes the default venue rules applicable to the agreement, that court will apply federal law and in doing so, give effect to the parties' agreement. *See The Bremen*, 407 U.S. at 12-13 ("There are compelling reasons why a freely negotiated private international agreement, unaffected by fraud, undue influence, or overweening bargaining power, such as that involved here, should be given full effect"); *Wong*, 589 F.3d at 828 ("We therefore hold that in this diversity suit, the enforceability of the forum selection clause is governed by federal law"); *Manetti-Farrow*, 858 F.2d at 513 ("[B]ecause enforcement of a forum clause necessarily entails interpretation of the clause before it can be enforced, federal law also applies to interpretation of forum selection clauses"). *But see Abbott Labs. v. Takeda Pharm. Co.*, 476 F.3d 421, 423 (7th Cir. 2007) ("Simplicity argues for determining the validity . . . of a forum selection clause . . . by reference to the law of the jurisdiction whose law governs the rest of the contract").

Following the majority rule, we thus conclude that a federal court interpreting a forum selection clause must apply federal law in doing so. As an agreement purporting to modify or waive the venue of a federal court, a forum selection clause implicates what is recognized as a procedural matter governed by federal law—the proper venue of the court. Using this reasoning, the Supreme Court applied federal law in enforcing a forum selection clause in a federal suit where a motion to transfer venue under 28 U.S.C. § 1404 had been filed. *See Stewart*, 487 U.S. at 32.

When construing forum selection clauses, federal courts have found dispositive the particular language of the clause and whether it authorizes another forum as an *alternative* to the forum of the litigation or whether it makes the designated forum *exclusive*. *See IntraComm*, 492 F.3d at 290 (ruling that a clause providing that either party "shall be free" to pursue its rights in a specified court did not preclude jurisdiction or venue in the forum court). As we said in *IntraComm*, "A general maxim in interpreting forum selection clauses is that 'an agreement *conferring* jurisdiction in one forum will not be interpreted as *excluding* jurisdiction elsewhere unless it contains specific language of exclusion.'" *Id.* (*quoting John Boutari & Son,* 22 F.3d at 53).

The language of the forum selection clause in this case, taken by itself and out of context, appears to make the designation of the English court permissive, as we construed a similar clause in *IntraComm*. That conclusion would be consistent with the principle of federal common law to make such clauses permissive unless they contain specific language of exclusion. But in this case the clause taken in context does contain what amounts, in effect, to language of exclusion. The clause here includes language that English law, not American federal law, must be applied. *See Yavuz*, 465 F.3d at 430 (holding that a court must honor the forum selection clause "as construed under the law specified in the agreement's choice-of-law provision"). And applying English law makes a difference, as the parties have recognized and stipulated. Under English law, when the parties designate the English High Court as an appropriate forum, the designation is mandatory and exclusive. The district court observed in this case, "[Albemarle] candidly concede[s] that the forum selection clause at issue would be considered to be mandatory under English law."

Moreover, the parties' stipulation about the effect of English law seems to be supported. *See* Commission Regulation 44/2001, art. 23, 2001 O.J. (L 12) 1 (EU), *amended by*

2002 307/28 (L 225) 2. This was directly confirmed recently by the English High Court, which ruled on the very contract before us: "As a matter of English law, which is the applicable law, that clause [in the same contract that is before us] would be construed as being an exclusive jurisdiction clause, as was conceded by Albemarle in the 2008 Action in light of Article 23.1 of the Judgements Regulation (No. 44/2001)." *AstraZeneca UK Ltd. v. Albemarle Int'l Corp.*, 34 [2010] EWHC 1028 (comm), [43].

## IV

Of course, we will give effect to the parties' selection of the English forum only if it would not be unreasonable to do so. Under *The Bremen*, a forum selection clause may be found unreasonable if:

> (1) [its] formation was induced by fraud or over-reaching; (2) the complaining party "will for all practical purposes be deprived of his day in court" because of the grave inconvenience or unfairness of the selected forum; (3) the fundamental unfairness of the chosen law may deprive the plaintiff of a remedy; or (4) [its] enforcement would contravene a strong public policy of the forum state.

*Allen v. Lloyd's of London*, 94 F.3d 923, 928 (4th Cir. 1996) (summarizing the *The Bremen* definition).

In this case, Albemarle contends that enforcement of the forum selection clause would violate a strong public policy of South Carolina, namely South Carolina's disfavor of such clauses as indicated in S.C. Code Ann. § 15-7-120(A), which reads:

> Notwithstanding a provision in a contract requiring a cause of action arising under it to be brought in a location other than as provided in this title and the

> South Carolina Rules of Civil Procedure for a similar cause of action, the cause of action alternatively may be brought in the manner provided in this title and the South Carolina Rules of Civil Procedure for such causes of action.

In effect, this statute makes all forum selection clauses permissive and thus would overrule the forum selection clause in this case, that makes the English forum exclusive. We reject Albemarle's public policy argument at several levels.

*First*, insofar as the South Carolina statue would purport to impose South Carolina procedural rules on a federal court, it would be preempted by federal law. Federal law explicitly regulates the appropriate venue in cases filed in federal court, and to the extent that a forum selection clause is invoked to change venue, federal law applies, as we have discussed above.

*Second*, state reluctance to recognize and enforce forum selection clauses was specifically addressed and countered by the Supreme Court's holding in *The Bremen*. In *The Bremen*, the Court acknowledged that "[m]any courts, federal and state, have declined to enforce [forum selection] clauses on the ground that they were 'contrary to public policy' or that their effect was to 'oust the jurisdiction' of the court." 407 U.S. at 9. But it rejected that rationale, noting that these courts' approach was based on the "provincial attitude regarding the fairness of other tribunals." *Id.* at 12. The Court thus held that, contrary to judicial disfavor of forum selection clauses such as that manifested in the South Carolina statute, in federal court, forum selection clauses enjoy a presumption of enforceability.

*Third*, we can find virtually no evidence to indicate that S.C. Code Ann. § 15-7-120(A), overriding exclusive forum selection clauses in favor of applying state procedural rules for venue, manifests a strong public policy of South Carolina.

We could find no South Carolina court that has so held. Indeed, we have cases in which South Carolina courts have enforced forum selection clauses in contracts, notwithstanding the existence of § 15-7-120(a). *See*, *e.g.*, *Sec. Credit Leasing, Inc. v. Armaly*, 529 S.E.2d 283, 290 (S.C. Ct. App. 2000); *Firestone Fin. Corp. v. Owens*, 419 S.E.2d 830 (S.C. Ct. App. 1992). And following South Carolina's cases, federal courts sitting in South Carolina have enforced forum selection clauses, notwithstanding the statute. *See*, *e.g.*, *Gregg v. GI Apparel, Inc.*, No. 3:05-2399-MBS, 2006 WL 346423 (D.S.C. Feb. 14, 2006); *Power-Linx, Inc. v. Satius, Inc.*, No. 4:05-cv-3281-TLW, 2006 WL 2038263 (D.S.C. Jul. 20, 2006); *Atl. Floor Servs., Inc. v. Wal-Mart Stores, Inc.*, 334 F. Supp. 2d 875, 877 (D.S.C. 2004). *But see Ins. Prod. Mktg., Inc. v. Indianapolis Life Ins. Co.*, 176 F. Supp. 2d 544, 550 (D.S.C. 2001); *accord Consol. Insured Benefits, Inc. v. Conseco Med. Ins. Co.*, 370 F. Supp. 2d 397, 401 (D.S.C. 2004).

*Fourth* and finally, it can hardly be a strong public policy to countermand the very policy that the Supreme Court adopted in *The Bremen*. *The Bremen* would have little effect if states could effectively override the decision by expressing disagreement with the decision's rationale. Classifying South Carolina's statute as manifesting a strong public policy within *The Bremen*'s reasoning would allow the very "provincial attitude" rejected by *The Bremen* to override the federal policy of favoring a contractual choice of forum.

V

If we were, in this case, to exclude the federal interests from our analysis—interests represented by federal venue rules and statutes and by the policy articulated in *The Bremen* — a traditional conflicts-of-laws analysis would apply, and in a diversity case involving breach of contract, that would begin with the Supreme Court's decision in *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487 (1941). In *Klaxon*, the Court stated, "The conflict of laws rules to be applied by [a] federal

court . . . must conform to those prevailing in [the] state courts. Otherwise, the accident of diversity of citizenship would constantly disturb equal administration of justice in coordinate state and federal courts sitting side by side." *Id.* at 496 (*citing Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 74-77 (1938)). Thus, for an action filed in South Carolina, South Carolina law would be consulted for its choice of law rules, and under those rules, South Carolina law would give effect to the parties' choice of law as specified in the contract. *See* S.C. Code Ann. § 36-1-105(1) (providing, as applicable here, "When a transaction bears a reasonable relation to this State and also to another state or nation the parties may agree that the law either of this State or of another state or nation shall govern their rights and duties").

In this case, the parties agreed to the application of English law, which would make the English forum exclusive and would override South Carolina's statute making all forum selection clauses permissive, *see* S.C. Code § 15-7-120(a), unless that statute manifested a strong public policy. But under state law, a state provision establishing, as a procedural matter, that the South Carolina venue rules trump any contractual agreement selecting an exclusive forum outside of South Carolina is not the type of provision that South Carolina courts have recognized as establishing a strong public policy of the State that would overrule the parties choice of law outside South Carolina. *See Nash v. Tindall Corp.*, 650 S.E.2d 81, 83-84 (S.C. Ct. App. 2007) (defining the public policy of the State to implicate foreign law when it "is against good morals or natural justice," such as "prohibited marriages, wagers, lotteries, racing, contracts for gaming or the sale of liquors, and others").

So whether we give effect to the parties' agreement as a matter of federal venue law or import the conflicts of laws rules from South Carolina, we end up in the same place, concluding that the parties agreed to the application of English law. Thus, even while federal law may have required a con-

struction rendering the forum selection clause permissive, English law must be applied, and it takes the clause as mandatory.

For the reasons given, we affirm the district court's ruling dismissing this case, based on enforcement of the parties' forum selection and choice of law clauses.

## VI

The parties here have negotiated for and agreed to a contractual provision which provides that this "contract shall be subject to English law and the jurisdiction of the English High Court." While an agreement to be *subject to the jurisdiction* of the English High Court could reasonably be taken to mean that the parties only authorize litigation there but do not exclude other appropriate forums, for the agreement to be *subject to English law*, of necessity, excludes the application of other law. And if English law construes the forum selection clause to mean that litigation must be conducted in the English High Court exclusively, as the parties agree that it does, then the entire contractual provision's meaning becomes free of ambiguity.

In agreeing to these provisions, the parties undoubtedly accepted that litigation on disputes arising under the 2005 contract would be conducted in England, just as they accepted that litigation on disputes arising under the 2008 contract would be conducted in South Carolina. It, therefore, cannot be surprising to them that we enforce the 2005 contract that way, especially in light of our longstanding tradition of favoring the enforcement of contracts according to their terms.

The Supreme Court's discussion in *The Bremen* sets forth the reasons for this fundamental policy. Enforcement gives effect to the legitimate expectations of the parties and eliminates uncertainty and unexpected inconvenience. Indeed, the Court pointed out then that "[t]he elimination of all such

uncertainties by agreeing in advance on a forum acceptable to both parties is an indispensable element in international trade, commerce, and contracting." *The Bremen*, 407 U.S. at 13-14; *see also Scherk*, 417 U.S. at 429-30 ("A contractual provision specifying in advance the forum in which disputes shall be litigated and the law to be applied is, therefore, an almost indispensable precondition to achievement of the orderliness and predictability essential to any international business transaction").

For the reasons given, we affirm the judgment of the district court.

*AFFIRMED*