RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 21a0243p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────────

LAKESIDE SURFACES, INC., a Michigan Corporation,

        *Plaintiff-Appellant*,

   *v.*

CAMBRIA COMPANY, LLC, a Foreign Limited Liability Company,

        *Defendant-Appellee*.

No. 20-1335

─────────────────

Appeal from the United States District Court
for the Western District of Michigan at Grand Rapids.
No. 1:18-cv-00110—Janet T. Neff, District Judge.

Argued: April 20, 2021

Decided and Filed: October 15, 2021

Before: GIBBONS, WHITE, and READLER, Circuit Judges.

─────────────────

## COUNSEL

─────────────────

**ARGUED:** Scott R. Murphy, BARNES & THORNBURG LLP, Grand Rapids, Michigan, for Appellant. Bryan Freeman, MASLON LLP, Minneapolis, Minnesota, for Appellee. **ON BRIEF:** Scott R. Murphy, Anthony Sallah, BARNES & THORNBURG LLP, Grand Rapids, Michigan, for Appellant. Bryan Freeman, James J. Long, Jevon C. Bindman, MASLON LLP, Minneapolis, Minnesota, for Appellee.

─────────────────

## OPINION

─────────────────

HELENE N. WHITE, Circuit Judge. Plaintiff Lakeside and Defendant Cambria entered into a business agreement with a forum-selection clause requiring all lawsuits to be brought in a

Minnesota state court.  Lakeside sued Cambria in a federal district court in Michigan.  Cambria moved to dismiss, invoking the forum-selection clause, and the district court granted the motion.  Lakeside appeals, arguing that the forum-selection clause is unenforceable.  We agree and reverse.

## I.

Plaintiff Lakeside Surfaces, Inc., a Michigan corporation, is a large fabricator of stone countertops in Michigan.  Defendant Cambria Company, LLC, a Minnesota company, is a leading nationwide manufacturer of countertop products—i.e., the stone slabs used to make countertops.  Lakeside buys "solid surface products" from manufacturers like Cambria, fabricates countertops based on specifications provided by customers, and sells the fabricated products to retailers, builders, designers, commercial firms, and local kitchen and bath stores.  R. 34 PID 370.  Cambria's countertops are a top seller for many designers and home builders throughout Michigan and the rest of the country, and they accounted for a large percentage of Lakeside's sales.  In 2011, Cambria recognized Lakeside's considerable sales of Cambria products and made Lakeside Cambria's fourteenth "Lexus Partner" in North America.  R. 34 PID 370.  On October 11, 2011, the two sides memorialized their relationship by executing a series of agreements, collectively titled the "Business Partner Agreements" (BPA).  R. 34 PID 370.

The BPA is a fifteen-page document consisting of five separate "agreements": (1) the Credit Agreement; (2) the Security Agreement; (3) Order Terms and Conditions; (4) Lifetime Limited Warranty; and (5) the Business Operating Requirements Manual Acknowledgment Form (BORM).  R. 4-1 PID 53-68.  All are part of a single, consecutively numbered document with a shared cover sheet titled, "Cambria Lexus Partner Program Business Partner Agreements."  *Id.*

The BPA described twenty-nine requirements for Lakeside to retain Lexus Partner status.  Some focused on infrastructure—e.g., possession of a forklift that can lift at least 7,500 pounds and capability to fabricate at least 10,000 square feet of Cambria product per month.  Others focused on loyalty to the Cambria brand.  Lakeside had to maintain monthly sales of at least two truckloads of Cambria product, meet yearly sales goals set by Cambria, and make Cambria products the "lead quartz surfacing product offered (80% of business)."  R. 4-1 PID 67.

Lakeside had to employ at least two full-time Cambria-focused sales reps, have company personnel attend "Cambria University" in Minnesota for training, "[p]romote[] Cambria brand only on all vehicle graphics," and invest "more than $50,000 in Cambria point of sale materials per year." *Id.*

The BPA had a choice-of-law provision and a forum-selection clause. Both are in a single paragraph:

> This agreement shall be governed by and construed in accordance with the laws of the State of Minnesota. Any proceeding involving this Agreement and/or any claims or disputes relating to the agreements and transactions between the parties shall be in the District Court of Le Sueur County, State of Minnesota, and the undersigned hereby submits to the jurisdiction and venue of that Court. The undersigned agrees not to raise and waives any objection or defense based upon the venue of such Court and any objection or defense based on forum non conveniens. The Customer also agrees to the terms and conditions of the other agreements included herein, Cambria Order Terms and Conditions, the Cambria Natural Quartz Lifetime Limited Warranty, and the Security Agreement (if any) which are hereby made a part of this Agreement.

R. 4-1 PID 56. The same page containing these provisions states that "This Agreement sets forth contractual terms between Cambria and the undersigned as to all business transactions between them, now and in the future."[1] *Id.*

For several years, Lakeside exceeded its contractual obligations. From 2015 to 2017, for example, it steadily increased the percentage of Cambria product it sold (relative to overall inventory), from 86.6% ($19.1 million) in 2015 to 98% ($23.4 million) in 2017. Lakeside spent $30,000 sending employees to Minneapolis for Cambria-related training, and between 2015 and 2017, invested $922,270 in advertising materials to promote Cambria products. In 2016 and 2017, at Cambria's request, Lakeside also spent over $1 million to build a "Cambria Design Gallery" in Grand Rapids, Michigan, and spent over $6.2 million to build a new fabrication facility. R. 34 PID 372.

---

[1]This language is found in the sub-section of the BPA titled "Credit Agreement." In another section of the BPA, titled "Lifetime Limited Warranty," there is another choice-of-law provision that selects Minnesota law to govern—"This Limited Warranty shall be interpreted exclusively under the laws of the State of Minnesota." R. 4-1 PID 63.

Lakeside says it built the fabrication facility in response to increased pressure from Cambria "push[ing] its fabricators . . . to increase capacity to handle at least 50,000 square feet of Cambria slabs per month and to sell 'exclusively' Cambria products." R. 34 PID 372. Lakeside more than doubled its fabrication capacity. And Lakeside alleges that its increase in Cambria sales to 98% in 2017 was a result of the same pressure. Lakeside says Cambria led it to expect that if it built the facility and increased Cambria sales to 98%, Cambria would make Lakeside the exclusive seller of Cambria products in Michigan.

The fabrication facility opened in April 2017. A few months later, in August, Lakeside met with Cambria's CEO in Cambria's Minnesota headquarters to discuss exclusivity. In the meeting, Lakeside "expressed its desire and expectation that Cambria consolidate the Michigan market by making Lakeside the sole fabricator." R. 34 PID 372. Talk continued after the meeting; in mid-October, Cambria said it would review Lakeside's strategic plan for servicing Michigan and northern Ohio as the sole Lexus Partner in Michigan.

In the meantime, Cambria heard that Lakeside was carrying a new quartz product made by another company. Unhappy, on January 3, 2018, Cambria sent an email asking about this development. Six days later, it told Lakeside it was terminating its relationship because Lakeside breached the Lexus Partner requirements. According to Lakeside, Cambria never specified how Lakeside breached, and never gave Lakeside a chance to cure any breach. Cambria immediately stopped all shipments of Cambria product to Lakeside and informed Lakeside's customers of the termination.

## II.

Invoking diversity jurisdiction, Lakeside filed suit in the Western District of Michigan. Lakeside's operative complaint brings claims for (i) breach of contract; (ii) violations of the Michigan Franchise Investment Law (MFIL); (iii) violation of the Uniform Commercial Code (UCC); and (iv) promissory estoppel.

Cambria filed a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), invoking the forum-selection clause. Lakeside responded that the forum-selection clause was unenforceable under *M/S Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1, 15 (1972). In *Bremen*,

the Supreme Court stated, among other things, that a forum-selection clause is unenforceable when it contravenes a strong public policy of the forum state. *Id.* Lakeside argued that the forum-selection clause contravened a strong public policy of Michigan because the BPA is a franchise agreement and the MFIL—which represents Michigan public policy—specifically provides that forum-selection clauses in franchise agreements are void. Cambria responded that the BPA's choice-of-law provision provided that Minnesota law governed, rendering the MFIL inapplicable. Lakeside replied that the choice-of-law provision did not extend to its MFIL claims and that the choice-of-law provision was unenforceable under Michigan's conflict-of-law principles.

The district court sided with Cambria. It first expressed doubt that *Bremen*'s forum-public-policy consideration applied. But then, assuming it did apply, the court concluded that the forum-selection clause did not violate Michigan's public policy because the parties' choice-of-law provision was enforceable and, therefore, rendered the MFIL inapplicable. The court then dismissed the case under the doctrine of forum non conveniens. Lakeside timely appealed.

### III.

The only question the parties raise on appeal is whether the parties' forum-selection clause is enforceable. In *Bremen*, the Supreme Court held that a forum-selection clause "should control absent a strong showing that it should be set aside." 407 U.S. at 15. Our case implicates one of the exceptions to enforceability that *Bremen* recognized: "[a] contractual choice-of-forum clause should be held unenforceable if enforcement would contravene a strong public policy of the forum in which suit is brought . . . ." *Id.* Lakeside contends that the forum-selection clause here is unenforceable under *Bremen*'s public-policy exception. Cambria disagrees and also argues that *Bremen*'s public-policy exception is not part of the enforceability analysis. Before resolving that issue, however, we first clarify the overall analytical framework.

### A.

Where, as here, "a forum-selection clause indicates that a matter should be heard by a state or foreign court, then *forum non conveniens* is the appropriate method of enforcement." *Boling v. Prospect Funding Holdings, LLC*, 771 F. App'x 562, 567 (6th Cir. 2019) (citing

*Atl. Marine Constr. Co. v. U.S. Dist. Ct. for the W. Dist. of Tex.*, 571 U.S. 49, 60–61 (2013)). A typical forum-non-conveniens analysis has three components: (1) the court "determines the degree of deference owed the plaintiff's forum choice," and then asks if the defendant has met its burden of (2) showing an "adequate alternative forum," and (3) showing that "the plaintiff's chosen forum is unnecessarily burdensome based on" a balancing of public-interest and private-interest factors. *Id.* at 568 (quoting *Hefferan v. Ethicon Endo-Surgery Inc.*, 828 F.3d 488, 492 (6th Cir. 2016)).[2]

The "calculus changes," however, when there is a valid and enforceable forum-selection clause. *Atlantic Marine*, 571 U.S. at 63; *see also Boling*, 771 F. App'x at 568 ("In *Atlantic Marine*, the Supreme Court concluded that an enforceable forum-selection clause alters this analysis . . . ."). In such cases, the plaintiff's choice of forum "merits no weight" and courts consider arguments only under the public-interest factors, treating the private-interest factors as "weigh[ing] entirely in favor of the preselected forum." *Atlantic Marine*, 571 U.S. at 63-64. The onus falls on the plaintiff to show that the public-interest factors defeat dismissal, and they rarely will. *Id.* at 64.

Because the presence of a valid and enforceable forum-selection clause alters the type of forum-non-conveniens analysis a court must apply, it follows that a court must first—before balancing the forum-non-conveniens factors—determine whether a forum-selection clause is applicable to the claims at issue, mandatory, valid, and enforceable. *See, e.g., Azima v. RAK Inv. Auth.*, 926 F.3d 870, 874-76 (D.C. Cir. 2019) (noting that the preliminary question is whether a forum-selection clause is "applicable, mandatory, valid, and enforceable," after which the court then "weigh[s] . . . the public- and private-interest [forum-non-conveniens] factors").

---

[2]The private factors include "the relative ease of access to sources of proof; availability of compulsory process for attendance of unwilling, and the cost of obtaining attendance of willing, witnesses; possibility of view of premises, if view would be appropriate to the action; and all other practical problems that make trial of a case easy, expeditious and inexpensive." *Hefferan*, 828 F.3d at 498 (quoting *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 508 (1947)). The public-interest factors include "administrative difficulties flowing from court congestion; the 'local interest in having localized controversies decided at home;' the interest in having the trial of a diversity case in a forum that is at home with the law that must govern the action; the avoidance of unnecessary problems in conflict of laws, or in the application of foreign law; and the unfairness of burdening citizens in an unrelated forum with jury duty." *Id.* at 500 (quoting *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 241 n.6 (1981)).

Several sister circuits have recognized the same, employing similar two-step approaches in post-*Atlantic Marine* decisions.[3]  Prior to *Atlantic Marine*, we did as well.  *See Wong v. PartyGaming Ltd.*, 589 F.3d 821, 830, 833 (6th Cir. 2009) (first holding that a "forum selection clause [was] enforceable" and only then "turn[ing] to the district court's dismissal for forum non conveniens"); *id.* at 826 ("[A]s a threshold matter, we must determine [enforceability].").

And similar to other circuits, *see Weber*, 811 F.3d at 768-69 (5th Cir.); *Azima*, 926 F.3d at 874-76 (D.C. Cir.); *Kelvion*, 918 F.3d at 1092 (10th Cir.), we have recognized in pre- and post-*Atlantic Marine* decisions that a different standard of review applies to enforceability determinations (de novo), on the one hand, and the balancing of forum-non-conveniens factors (abuse of discretion), on the other.  *See Wong*, 589 F.3d at 826, 830; *Boling*, 771 F. App'x at 568.  This approach implicitly recognizes that the two questions are distinct.

In sum, then, when assessing a forum-non-conveniens motion relying on a forum-selection clause, we first ask several contract-specific questions, including whether the forum-selection clause is applicable, mandatory, valid, and enforceable.  An answer of "yes" to all those questions means *Atlantic Marine*'s modified forum-non-conveniens analysis applies and the plaintiff bears the burden of showing that the public factors weigh heavily against dismissal; an answer of "no" to any of them means the traditional forum-non-conveniens analysis applies instead.  We review the district court's assessment of the first group of questions de novo and review its balancing of the forum-non-conveniens factors for abuse of discretion.  *Wong*, 589 F.3d at 826.

---

[3]*See Weber v. PACT XPP Techs., A.G.*, 811 F.3d 758, 768-69 (5th Cir. 2016) ("We review the district court's interpretation of the FSC and its assessment of that clause's enforceability *de novo*, then we review for abuse of discretion the court's balancing of the private- and public-interest factors."); *Kelvion, Inc. v. PetroChina Canada Ltd.*, 918 F.3d 1088, 1092 (10th Cir. 2019) (adopting *Weber*'s approach); *Azima*, 926 F.3d at 874-76 (same); *see also GDG Acquisitions, LLC v. Gov't of Belize*, 749 F.3d 1024, 1029 (11th Cir. 2014) (instructing district court on remand to first determine if forum-selection clause "is enforceable" and then, depending on answer, balance relevant forum-non-conveniens factors); *Collins v. Mary Kay, Inc.*, 874 F.3d 176, 181, 186–87 (3d Cir. 2017) (first discussing enforceability and scope of forum-selection clause and then, in subsequent section of opinion, addressing application of forum-non-conveniens factors); *Olde Homestead Golf Club v. Elec. Transaction Sys. Corp.*, 714 F. App'x 186, 190 (3d Cir. 2017) (same).

## IV.

The parties here dispute only the forum-selection clause's enforceability.  Their dispute focuses on *Bremen*'s public-policy exception, which, again, recognizes that "[a] contractual choice-of-forum clause should be held unenforceable if enforcement would contravene a strong public policy of the forum in which suit is brought . . . ."  407 U.S. at 15.

Lakeside contends that enforcing the forum-selection clause would violate a strong public policy of Michigan because the clause is contained in a franchise agreement, and the Michigan Franchise Investment Law (MFIL) voids out-of-state forum-selection clauses contained in franchise agreements.  *See* MCL § 445.1527(f) (stating that any "provision requiring that arbitration or litigation be conducted outside this state" is "void and unenforceable if contained in any documents relating to a franchise.").[4]  Cambria responds that (1) *Bremen*'s public policy rule does not apply and (2) even if it did, the parties' choice-of-law provision renders the MFIL—and any public policy it represents—inapplicable.  We address both arguments in turn.

## A.

Cambria first argues that *Bremen*'s public-policy exception is inapplicable.  Although Cambria did not raise this issue below, the district court raised it sua sponte, so we will address it. *Raines v. United States*, 898 F.3d 680, 687 (6th Cir. 2018).

Cambria relies on our 2009 decision in *Wong*.  *Wong* held that under *Erie*,[5] federal courts sitting in diversity should apply federal common law—rather than state law—to determine the enforceability of a forum-selection clause.  589 F.3d at 827-28.  At the time *Wong* was decided, most of the other circuits to consider the issue had reached the same conclusion.  *Id.*[6]

---

[4]The district court held that Lakeside's allegations satisfied the MFIL's elements for establishing a franchise relationship.  Cambria does not challenge this determination for purposes of this appeal, except for a one-sentence footnote stating that it "in no way concedes, and in fact contests" this conclusion.  Because Cambria offers no developed argument, we assume for purposes of this appeal that the BPA was a franchise agreement under the MFIL.  *See Wedgewood Ltd. P'ship I v. Twp. of Liberty*, 610 F.3d 340, 348 (6th Cir. 2010).

[5]*Erie R.R. Co. v. Tompkins*, 304 U.S. 64 (1938).

[6]The circuits *Wong* identified as forming the majority were the Second, Third, Fifth, Eighth, Ninth, and Eleventh, while the Seventh and Tenth Circuits held that state law applies.  *Id.* at 827 & n.5.  The Fourth, First, and D.C. Circuits had not taken a position on that question when *Wong* was issued, but the Fourth Circuit joined the

After surveying those decisions, we "adopt[ed]" the "law used in the majority of circuits," emphasizing the "importance of maintaining harmony among the Circuits on issues of law" and avoiding "inconsistent decisions in diversity cases" on "an issue of great economic consequence." *Id.* We then listed enforceability "factors," omitting any mention of public policy:

> When evaluating the enforceability of a forum selection clause, this court looks to the following factors: (1) whether the clause was obtained by fraud, duress, or other unconscionable means; (2) whether the designated forum would ineffectively or unfairly handle the suit; and (3) whether the designated forum would be so seriously inconvenient such that requiring the plaintiff to bring suit there would be unjust.

*Id.* at 828 (citing *Sec. Watch, Inc. v. Sentinel Sys., Inc.*, 176 F.3d 369, 375 (6th Cir. 1999)). Cambria argues that after *Wong*, *Bremen*'s public-policy exception is not part of the enforceability inquiry.

Although *Wong* was our first decision to definitively decide the *Erie* question whether federal common law governs the enforceability of forum-selection clauses in diversity cases, it was not the first to articulate relevant principles governing the enforceability inquiry. Several previous diversity cases had done so without deciding the *Erie* question because, in those cases, state law provided the same standard as did federal common law. *See, e.g.*, *Preferred Cap., Inc. v. Assocs. in Urology*, 453 F.3d 718, 721 (6th Cir. 2006); *Sec. Watch, Inc.*, 176 F.3d at 375; *Baker v. LeBoeuf, Lamb, Leiby & Macrae*, 105 F.3d 1102, 1105 (6th Cir. 1997).

In one of those decisions, *Shell v. R.W. Sturge, Ltd.*, 55 F.3d 1227, 1229-30 (6th Cir. 1995), we recognized that *Bremen*'s public-policy factor was part of the relevant analysis. In *Shell*, the plaintiffs—Ohio investors—brought Ohio securities-law claims against several London-based financial entities in an Ohio state court, and the defendants removed to federal court under diversity jurisdiction. *Id.* at 1228-29. The parties had a forum-selection clause vesting English courts with exclusive jurisdiction, and the district court dismissed the case based on that clause. *Id.* The plaintiffs raised an enforceability challenge on appeal, and we affirmed.

---

majority position the following year. *See Albemarle Corp. v. Astrazeneca UK Ltd.*, 628 F.3d 643, 650 (4th Cir. 2010). The First and D.C. Circuits still do not appear to have taken a position on this issue. *See Atlas Glass & Mirror, Inc. v. Tri-North Builders, Inc.*, 997 F.3d 367, 374 (1st Cir. 2021) (declining to decide *Erie* question).

We began our analysis by noting that we did not need to decide the *Erie* question because "both Ohio and federal law treat these clauses in a similar manner." *Id.* at 1229. We then relied solely on federal decisions—providing federal common-law principles—to resolve the appeal. We recognized that *Bremen* supplied the relevant standard, including its forum-policy exception:

> "The correct approach [is] to enforce the forum clause specifically unless" plaintiffs "[can] clearly show that enforcement would be unreasonable and unjust, or that the clause was invalid for such reasons as fraud or overreaching." *Bremen*, 407 U.S. at 15. The presumptive validity of the forum selection clause may also be set aside if plaintiffs can show that "trial in the contractual forum will be so gravely difficult and inconvenient that [they] will for all practical purposes be deprived of [their] day in court," *id.* at 18, or if "enforcement would contravene a strong public policy" of the forum state. *Id.* at 15.

*Id.* at 1229–30 (citations omitted). Later in the opinion, we specifically applied the "public policy" exception, addressing plaintiffs' argument that we should not "enforce the forum selection clauses in light of the strong public policy behind Ohio's registration and merit review requirements," which plaintiffs said aimed to protect the public from its own "'stupidity, gullibility, and avariciousness." *Id.* at 1231 (citation omitted). We noted that the "District Court correctly held that under *Bremen*, plaintiffs must show that Ohio public policy outweighs" countervailing policies favoring the enforceability of forum-selection clauses. *Id.* But because British law provided remedies that did not offend the policies behind Ohio's securities laws, we held that enforcing the forum-selection clause would not impermissibly contravene Ohio's public policy. *Id.* at 1231-32.

Cambria argues that *Bremen*'s public-policy exception is inapplicable in diversity cases because *Wong* did not mention it and "[t]here is no basis to believe that this Court simply forgot to include the 'strong public policy' factor as a prong in *Wong*." Cambria Br. at 16. It also suggests that *Bremen* is distinguishable because it was an admiralty case, not a diversity-jurisdiction case. Lakeside responds that under *Shell*, a binding published decision decided in the diversity-jurisdiction context, *Bremen*'s public-policy exception is part of the analysis.

We agree with Lakeside that *Bremen*'s public-policy exception is part of the enforceability analysis. *Shell* was decided before *Wong*. In situations where two of our published decisions are in tension, we follow the earlier one. *Darrah v. City of Oak Park*,

255 F.3d 301, 309 (6th Cir. 2001). Here, it is not even clear that application of this principle is necessary, because *Wong* never affirmatively says that the public-policy exception is inapplicable. Adopting Cambria's reading of *Wong* would potentially create an unnecessary conflict between two of our decisions. And were we to do so, we would have to follow the older decision, *Shell*.

In addition, as Lakeside points out, almost every other circuit to address the question treats *Bremen*'s public-policy exception as part of the analysis, and circuits that have adopted the majority view on the *Erie* question have done so.[7] Even among the four circuits that have not joined the majority view on the *Erie* question, all but the Tenth Circuit have held that when federal common law *does* govern enforceability, *Bremen*'s public-policy exception is part of the analysis.[8]

This near unanimity supports Lakeside and further undermines Cambria's position. *Wong* itself emphasized the importance of maintaining uniformity among circuits and avoiding inconsistent standards in diversity cases as one of the reasons to "adopt" the same position as the circuits in the majority on the *Erie* question. Cambria's reading would make the Sixth Circuit stand alone among the majority *Wong* sought to join. It would mean that courts in the Sixth

---

[7]*See, e.g.*, *Gemini Techs., Inc. v. Smith & Wesson Corp.*, 931 F.3d 911, 914-15 (9th Cir. 2019); *Al-Copeland Invs., L.L.C. v. First Specialty Ins. Corp.*, 884 F.3d 540, 543 (5th Cir. 2018); *Collins v. Mary Kay, Inc.*, 874 F.3d 176, 181 (3d Cir. 2017); *Union Elec. Co. v. Energy Ins. Mut.*, 689 F.3d 968, 973-74 (8th Cir. 2012); *Albemarle Corp. v. AstraZeneca UK Ltd.*, 628 F.3d 643, 650-52 (4th Cir. 2010); *Phillips v. Audio Active Ltd.*, 494 F.3d 378, 392 (2d Cir. 2007).

[8]The First and D.C. Circuits have not decided the *Erie* issue, while the Seventh and Tenth apply state law in diversity cases. In *Rivera v. Centro Medico de Turabo, Inc.*, 575 F.3d 10, 17 (1st Cir. 2009), the First Circuit declined to decide the *Erie* question because federal common-law and Puerto Rico's law did not diverge, and "therefore appli[ed] federal common law" in a diversity-jurisdiction context. Applying federal law, the court recognized that *Bremen*'s public-policy exception was part of the standard. *Id.* at 18; *see also Atlas Glass*, 997 F.3d at 375 (1st Cir. 2021) (same). The Seventh Circuit, in general, applies state law to determine enforceability in diversity cases. *Abbott Lab'ys v. Takeda Pharm. Co.*, 476 F.3d 421, 423 (7th Cir. 2007). But in *Jackson v. Payday Fin., LLC*, 764 F.3d 765, 774–76 (7th Cir. 2014), a diversity case, the parties' agreement designated tribal law and the law of the Constitution's Indian Commerce Clause to govern, and the pertinent tribal law did not address the enforceability of forum-selection clauses. In that context, the court noted that federal common law could stand in, and stated that under federal common law, a forum-selection clause may be unenforceable if it "would contravene a strong public policy of the forum in which the suit is brought." *Id.* (quoting *Bonny v. Soc'y of Lloyd's*, 3 F.3d 156, 160 (7th Cir. 1993)). The D.C. Circuit, in a recent federal-question-jurisdiction case, has also recognized *Bremen*'s public-policy rule as part of the analysis. *See Azima*, 926 F.3d at 874-75.

Circuit—when applying federal common law—do not consider *Bremen*'s public-policy exception although courts in almost every other circuit would.

Because we already recognized in *Shell* that *Bremen*'s public-policy exception is part of the enforceability inquiry, and because almost every other circuit has done the same, we hold that *Bremen*'s public-policy exception is part of the applicable analysis.[9] We thus ask whether Lakeside can defeat the strong presumption in favor of enforceability by showing that (1) the clause was obtained by fraud, duress, or other unconscionable means; (2) the designated forum would ineffectively or unfairly handle the suit; (3) the designated forum would be so seriously inconvenient that requiring the plaintiff to bring suit there would be unjust; or (4) enforcing the forum selection clause would contravene a strong public policy of the forum state. *Wong*, 589 F.3d at 828; *Shell*, 55 F.3d at 1229–30. Lakeside invokes only the fourth basis. We turn to it now.

**B.**

**1.**

Lakeside argues that enforcing the BPA's forum-selection clause would contravene a strong public policy of Michigan because the MFIL renders "void and unenforceable" any provision in a franchise agreement "requiring that . . . litigation be conducted outside this state."

---

[9]The parties do not raise it, but we acknowledge that there may be some question whether *Bremen*'s public-policy exception continues to suffice on its own to render a forum-selection clause unenforceable after *Atlantic Marine*. While future litigants might argue otherwise, the Ninth Circuit recently concluded that *Bremen*'s public-policy exception remains applicable and sufficient to render a forum-selection clause unenforceable, and we find no compelling reason to depart from *Bremen* today. *See Gemini*, 931 F.3d at 914-15 ("The Court in *Atlantic Marine* hardly discussed *Bremen*. To the extent that it did, it reaffirmed *Bremen*'s core holding. . . . Unsurprisingly then, our sister circuits have consistently held that *Bremen* continues to provide the law for determining the validity and enforceability of a forum-selection clause."); *id.* at 915-17 ("*Bremen* remains good law. . . . Prior to *Atlantic Marine*, we treated a strong showing under any one of the *Bremen* factors as sufficient grounds for not enforcing a forum-selection clause. . . . We [now] take the opportunity to clarify that satisfaction of *Bremen*'s public policy factor continues to suffice to render a forum-selection clause unenforceable. *Bremen* held that '[a] contractual choice-of-forum clause should be held unenforceable *if* enforcement would contravene a strong public policy of the forum in which suit is brought, whether declared by statute or by judicial decision. We have found nothing in *Atlantic Marine* that compels a different rule. . . . [And e]ven if we [decided] that *Atlantic Marine*'s reasoning undermines *Bremen*, only the Supreme Court has the prerogative to overrule or modify *Bremen*. *Atlantic Marine* did not overrule *Bremen*." (citations omitted)); *see also Davis v. Oasis Legal Fin. Operating Co.*, 936 F.3d 1174, 1178 (11th Cir. 2019) (holding forum-selection clause unenforceable solely based on public-policy exception); *DeBello v. VolumeCocomo Apparel, Inc.*, 720 F. App'x 37, 40 (2d Cir. 2017) ("[A] forum selection clause may be deemed invalid based solely on its conflict with a strong public policy of the forum state.").

MCL § 445.1527(f). We have recognized that the MFIL represents a "fundamental" public policy of Michigan. *Banek Inc. v. Yogurt Ventures U.S.A., Inc.*, 6 F.3d 357, 361-62, 362 n.3 (6th Cir. 1993). So have Michigan courts. *Bence v. Cottman Transmission Sys.,* 2007 WL 283838, at *4 (Mich. Ct. App. Feb. 1, 2007) ("Michigan has a very strong public policy interest in applying the MFIL."); *Martino v. Cottman Transmission Sys., Inc.*, 554 N.W.2d 17, 21 (Mich. Ct. App. 1996) (same). Lakeside's position, then, is straightforward and intuitive; Michigan's policy could not be clearer and enforcing the forum-selection clause here would violate that policy.

Other sections of the MFIL bolster that conclusion. The MFIL, for example, requires franchisors to provide franchisees with a list of the provisions the statute renders void, along with a written statement advising a franchisee that if any of these provisions "are in these franchise documents, [they] are void and cannot be enforced against you." MCL §§ 445.1527, 445.1508(3)(i). If a franchisor fails to provide that notice, the MFIL gives franchisees a private cause of action for damages or rescission. *Id.* § 445.1531(1). This structure—which ensures that franchisees retain the protection of the MFIL's void-provision list—demonstrates that the MFIL's prohibition on forum-selection clauses is a central part of the protection that Michigan's legislature sought to guarantee to franchisees.**[10]**

The MFIL's forum-selection-clause prohibition is also a limited and targeted departure from the state's normal policies regarding forum-selection clauses. Usually, "Michigan's public policy favors the enforcement of contractual forum-selection clauses." *Turcheck v. Amerifund Fin., Inc.*, 725 N.W.2d 684, 688 (Mich. Ct. App. 2006). The MFIL represents a specific public policy choice by the Michigan legislature to alter that default presumption in the narrow area of franchise agreements. Accordingly, this case does not raise the same slippery-slope concerns that might be present in a case involving a generalized prohibition on forum-selection clauses. We offer no comment on whether such a clause would also suffice. *Compare Albemarle*, 628 F.3d at 652 (noting that applying *Bremen*'s public-policy exception to such a statute might

---

**[10]**Michigan courts have recognized the fundamental nature of this notice. *See, e.g.*, *Martino*, 554 N.W.2d at 20-21 (declining to enforce choice-of-law provision selecting Pennsylvania franchise law to govern, reasoning that since Pennsylvania's law did not have a comparable requirement to provide notice of void provisions—or a rescission remedy for violations—applying Pennsylvania law would cause a "substantial loss of protection provided by the MFIL" and "violate[] the fundamental public policy of Michigan").

cause the exception to engulf *Bremen*'s general rule favoring enforcement of forum-selection clauses), *with Gemini*, 931 F.3d at 916 (rejecting similar concerns).

In light of these considerations, we conclude that the MFIL's prohibition on forum-selection clauses is a strong Michigan public policy and that enforcing the forum-selection clause here would clearly contravene that policy. *See Davis v. Oasis Legal Fin. Operating Co.*, 936 F.3d 1174, 1178–79 (11th Cir. 2019) (holding forum-selection clause unenforceable under *Bremen*'s public-policy exception where forum state, Georgia, prohibited forum-selection clauses in state payday-lending statute); *Jones v. GNC Franchising, Inc.*, 211 F.3d 495, 497-98 (9th Cir. 2000) (holding the same in context of forum-selection-clause prohibition in California's franchise statute).

**2.**

Cambria argues that the MFIL's prohibition on forum-selection clauses does not apply because the parties chose Minnesota law to govern their dispute. It notes that outside of the MFIL context, "Michigan's public policy favors the enforcement of contractual forum-selection clauses," *Turcheck*, 725 N.W.2d at 688, and that we have recognized that although the MFIL voids forum-selection clauses, it does not have a similar provision voiding *choice-of-law* provisions, which is itself a public-policy choice, *Banek*, 6 F.3d at 360. Combining these two points, Cambria argues that the choice-of-law provision renders the MFIL (and any anti-forum-selection public policy it embodies) inapplicable, and that this is consistent with Michigan public policy.

Cambria relies on our decision in *Banek*. But *Banek* is distinguishable. There, a Michigan franchisee sued a Georgia franchisor in a Michigan state court, bringing claims for breach of contract and violation of the MFIL, among others. The franchisor removed to federal court. *Id.* at 359. The franchise agreement contained a choice-of-law provision providing that Georgia law would govern. *Id.* The district court held that Georgia law thus governed and dismissed the MFIL claims. *Id.* On appeal, the plaintiff argued that the choice-of-law provision was void under the MFIL, but we disagreed. *Id.* at 359-60.

We emphasized that that the legislature chose to specifically prohibit forum-selection clauses but omitted any similar prohibition of choice-of-law provisions. *Id.* at 360. We reasoned that this represented a policy choice that appeared to mandate "litigating in Michigan" but allow for the possibility that "Michigan law [need not always] govern the dispute":

> Seemingly, the Michigan legislature understood that the burdens of being forced to arbitrate a claim in a foreign forum are significant, as subsection (f) makes arbitration or litigation forum selection clauses void. However, litigating in Michigan does not require that Michigan law must govern the dispute. The statute does not expressly void choice of law provisions, and we decline to imply such a prohibition. The Michigan legislature may have purposefully omitted choice of law provisions from those clauses prohibited because it may have realized that other states' laws might provide more protection to franchisees; thus, if a franchisee and franchisor want to choose a different state's law to govern any disputes, the parties may so contract. . . .

*Id.* We also noted that the legislature might have decided that prohibiting choice-of-law provisions could make Michigan "a less desirable target state for franchisors," given that national franchisors desire uniformity and that costs increase when dealing with different laws. *Id.* Finally, we pointed out that the plaintiff—litigating in Michigan—"has not shown how the application of Georgia law would violate any specific public policy of Michigan." *Id.* at 361.

Cambria relies on *Banek* for the proposition that the MFIL does not render choice-of-law provisions void, which is true. *Banek*, however, differs from our case in a crucial respect: it involved a challenge to the choice of Georgia law under a contractual choice-of-law provision where there was no forum-selection clause involved. Recognizing the MFIL's public policy barring forum-selection clauses requiring litigation in out-of-state courts and noting the absence of a public policy rejecting choice-of-law provisions, we upheld the choice-of-law provision, concluding that "litigating in Michigan does not require that Michigan law must govern the dispute." *Id.* at 360.

But here, there *is* a forum-selection clause, so our case presents a wrinkle not present in *Banek*. Unlike in *Banek*, accepting Cambria's position that the choice-of-law provision makes the MFIL's forum-selection-clause prohibition irrelevant would prevent the parties from "litigating in Michigan." *Banek*, 6 F.3d at 360. And unlike in *Banek*, where the plaintiff could not show how application of another state's law "violate[d] any specific public policy of

Michigan," the violation here is clear: Cambria seeks to invoke the choice-of-law provision to sidestep Michigan's otherwise-clear prohibition on forum-selection clauses in franchise agreements. In other words, Cambria seeks to use something the MFIL does not prohibit (choice-of-law provisions) to do something the law otherwise expressly prohibits (forcing a franchisee to litigate in an out-of-state forum).

From the text of the MFIL, we doubt that the legislature—which never mentioned choice-of-law provisions at all, but specifically chose to prohibit forum-selection clauses—intended to let franchisors so easily sidestep the MFIL's forum protections. Our skepticism is bolstered by the presence of the MFIL's strict notice requirement, which requires franchisors to inform franchisees of all provisions the MFIL renders void before executing a franchise agreement and provides a right of rescission if the franchisor fails to do so. Under Cambria's view, a franchisor could simply insert a choice-of-law provision into that agreement and thus relieve itself of the obligation to provide *any* notice to the franchisee that certain provisions may be void. Indeed, that happened here; according to the complaint, Cambria never gave Lakeside any statutorily required notice.

We note, however, that our ruling does not negate the choice-of-law provision in the Credit Agreement. The MFIL claim is not Lakeside's only claim, and the choice-of-law provision may be applied, as appropriate, to causes of action within its scope.

\* \* \*

In short, we conclude that *Bremen*'s public policy inquiry continues to be part of the enforceability analysis; the choice-of-law provision did not render the MFIL's prohibition on forum-selection clauses inapplicable; and enforcing the forum-selection clause would contravene a strong public policy of the forum state. The forum-selection clause is thus unenforceable. We therefore REVERSE and REMAND for further proceedings consistent with this opinion.